88 N.Y.2d 56 (1996)
666 N.E.2d 185
643 N.Y.S.2d 480
In the Matter of New York State Chapter, Inc., Associated General Contractors of America, et al., Appellants,
v.
New York State Thruway Authority et al., Respondents. Local 40, International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO, et al., Intervenors-Respondents.
In the Matter of General Building Contractors of New York State, Inc., et al., Appellants,
v.
Dormitory Authority of the State of New York et al., Respondents.
Court of Appeals of the State of New York.
Argued January 10, 1996.
Decided March 28, 1996.
Bryant, O'Dell & Basso, LLP, Syracuse (Robert H. Basso, Vic J. Kopnitsky, Jr., and Linda E. Alario of counsel), for appellants in the first above-entitled proceeding.
Bond, Schoeneck & King, Syracuse (Robert W. Kopp and John Gaal of counsel), and Dennis C. Vacco, Attorney-General, New York City (Peter H. Schiff, Daniel F. De Vita and M. Patricia Smith of counsel), for respondents in the first above-entitled proceeding.
Colleran, O'Hara & Mills, Garden City (Edward J. Groarke and John F. Mills of counsel), for Local 40, International Association of Bridge, Structural and Ornamental Iron Workers, intervenor-respondent in the first above-entitled proceeding.
Plunkett & Jaffe, P. C., Albany (Patrick E. Brown and John S. Harris of counsel), for New York State Building and Construction Trades Council, AFL-CIO, intervenor-respondent in the first above-entitled proceeding.
Murphy Smith & Polk (Charles E. Murphy and Robert P. Casey, of the Illinois Bar, admitted pro hac vice, of counsel), for Associated General Contractors of America, Inc., amicus curiae in the first above-entitled proceeding.
Sherman, Dunn, Cohen, Leifer & Yellig (Laurence J. Cohen and Victoria L. Bor, of the District of Columbia Bar, admitted pro hac vice, of counsel), for Building and Construction Trades Department, AFL-CIO, amicus curiae in the first and second above-entitled proceedings.
Gates & Adams, Rochester (Anthony J. Adams, Jr., of counsel), for appellants in the second above-entitled proceeding.
Morgan, Lewis & Bockius LLP, New York City (Bradford W. Coupe and James P. Philbin III of counsel), and Dennis C. Vacco, Attorney-General, New York City (Victoria A. Graffeo, Peter H. Schiff, Daniel F. De Vita and M. Patricia Smith of counsel), for respondents in the second above-entitled proceeding.
Venable, Baetjer, Howard & Civiletti, LLP (Maurice Baskin, of the District of Columbia Bar, admitted pro hac vice, of counsel), for Associated Builders and Contractors, Inc., amicus curiae in the second above-entitled proceeding.
Judges TITONE, BELLACOSA, LEVINE and CIPARICK concur with Chief Judge KAYE; Judge SMITH dissents and votes to reverse in a separate opinion in which Judge SIMONS concurs.
Judges TITONE, BELLACOSA, LEVINE and CIPARICK concur with Chief Judge KAYE; Judge SMITH concurs in result in a separate opinion in which Judge SIMONS concurs.
*64 Chief Judge KAYE.
Can public authorities governed by New York's competitive bidding laws lawfully adopt prebid specifications known *65 as Project Labor Agreements (PLAs) for construction projects? We conclude that PLAs are neither absolutely prohibited nor absolutely permitted in public construction contracts. A PLA will be sustained for a particular project where the record supporting the determination to enter into such an agreement establishes that the PLA was justified by the interests underlying the competitive bidding laws. Here, that burden was satisfied by the Thruway Authority but not the Dormitory Authority (DASNY).

Project Labor Agreements
By way of background, a PLA is a prebid contract between a construction project owner and a labor union (or unions) establishing the union as the collective bargaining representative for all persons who will perform work on the project. The PLA provides that only contractors and subcontractors who sign a prenegotiated agreement with the union can perform project work. A PLA thus generally requires all bidders on the project to hire workers through the union hiring halls; follow specified dispute resolution procedures; comply with union wage, benefit, seniority, apprenticeship and other rules; and contribute to the union benefit funds. In return for a project owner's promise to insist in its specifications that all successful bidders agree to be covered by a PLA, the union promises labor peace through the life of the contract (see, Associated Bldrs. & Contrs. v Massachusetts Water Resources Auth., 935 F.2d 345, 360 [Breyer, Ch. J., dissenting], revd sub nom. Building & Constr. Trades Council v Associated Bldrs. & Contrs. of Mass./ R. I., 507 US 218 [the Boston Harbor case]).
By comprehensively requiring all bidders to conform to a variety of union practices and limiting their autonomy to negotiate employment terms with a labor pool that includes nonunion workers  attributes that, by their scope, set these agreements apart from more common specifications, like construction materials or design criteria  PLAs have an anticompetitive impact on the bidding process (see, 207 AD2d 26, 30; Harms Constr. Co. v New Jersey Turnpike Auth., 137 NJ 8, 44, 644 A2d 76). Because in particular instances there are, however, also efficiencies to be gained, PLAs have been utilized in major construction projects such as the Boston Harbor (Boston Harbor, 507 US 218, supra), the Cleveland sports complex (Northern Ohio Ch. of Associated Bldrs. & Contrs. v Gateway Economic Dev. Corp., 1992 WL 119375 [US Dist Ct, ND Ohio]) *66 and the Massachusetts Central Artery/Third Harbor Tunnel (Utility Contrs. Assn. v Department of Pub. Works, 29 Mass App Ct 726, 565 NE2d 459 [1991]).
The backdrop for the present appeals is the United States Supreme Court decision in Boston Harbor. Recognizing the uniqueness of the construction industry, Congress in 1959 amended the National Labor Relations Act (NLRA) to permit prehire agreements in private construction contracts (29 USC § 158 [f]). At issue in Boston Harbor was whether the NLRA permitted a public authority to require as a prerequisite to the award of a public contract that the winning bidder and its subcontractors abide by a PLA previously negotiated between a labor consultant and the Boston Metropolitan District Building and Construction Trades Council. The Court concluded:
"It is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a longstanding custom of prehire bargaining in the industry. * * *
"There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same." (Boston Harbor, 507 US at 231 [citations omitted].)
While Boston Harbor stimulated local and State interest in PLAs, that decision held only that Federal labor law does not prohibit a public entity from using the same NLRA exception as is available to private purchasers of construction services. The decision did not go further to resolve the question before us: whether in light of competitive bidding mandates a public entity can enter into a PLA.
Recently, the New Jersey Supreme Court  the first State high court to decide the question  concluded that PLAs were *67 prohibited by that State's public bidding statutes, which foster "unfettered competition" in public contracts (Harms, 137 NJ at 44, 644 A2d at 95, supra; but see, State ex rel. Associated Bldrs. & Contrs., Cent. Ohio Ch. v Jefferson County Bd. of Commrs., 106 Ohio App 3d 176, 665 NE2d 723 [Ohio Ct App 1995], appeal dismissed 74 Ohio St 3d 1499, 659 NE2d 314 [1996] [PLA did not violate Ohio competitive bidding statute]). Because we have never construed New York's competitive bidding statutes to be so absolute, we answer the question differently.

Statutory Framework
New York has a multitude of procurement statutes applicable to public entities, but the underlying purpose is uniform: to assure prudent use of public moneys and to facilitate the acquisition of high quality goods and services at the lowest possible cost (see, e.g., General Municipal Law § 100-a). This Court has several times revisited New York's requirement for competitive bidding in the disposition of public contracts.
In Gerzof v Sweeney (16 N.Y.2d 206), for example, we reviewed a bid specification of the Board of Trustees of the Village of Freeport on a municipal contract that required experience constructing three generators of a specific type. The requirement had the effect of severely limiting competitive bidding for all but one manufacturer. This Court held that the specification violated General Municipal Law § 103, which provided that all contracts for public works were to be awarded to the lowest responsible bidder:
"We do not mean to suggest that specifications for public projects are illegal merely because they tend to favor one manufacturer over another. More must appear in order to render the specifications and the contract based thereon illegal * * * However, an objectionable and invalidating element is introduced when specifications are drawn to the advantage of one manufacturer not for any reason in the public interest but, rather, to insure the award of the contract to that particular manufacturer. * * * Such a scheme or plan is illegal in the absence of a clear showing that it is essential to the public interest." (Id. at 211-212.)
Thus, it is manifest from Gerzof that New York's competitive bidding statutes do not compel unfettered competition, but do *68 demand that specifications that exclude a class of would-be bidders be both rational and essential to the public interest.
In Jered Contr. Corp. v New York City Tr. Auth. (22 N.Y.2d 187, 192-193), we identified the strong public policy behind the competitive bidding statutes as "fostering honest competition in order to obtain the best work or supplies at the lowest possible price. In addition, the obvious purpose of such statutes is to guard against favoritism, improvidence, extravagance, fraud and corruption." Again, in Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth. (66 N.Y.2d 144, 148), the Court described the purpose of the competitive bidding statutes as promotion of the public interest by "fostering honest competition in the belief that the best work and supplies might thereby be obtained at the lowest possible prices."
Most recently in Associated Bldrs. & Contrs. v City of Rochester (67 N.Y.2d 854), we found a violation of General Municipal Law § 103 where approximately 50 nonunion contractors challenged a City ordinance providing preferences to bidders whose employees participated in a State-approved apprenticeship program. We struck down the apprenticeship program "precondition" as not linked to the interests embodied in the competitive bidding statutes, regardless of its furtherance of otherwise enunciated public policy (see also, American Inst. for Imported Steel v Office of Gen. Servs., 47 AD2d 118, affd 38 N.Y.2d 991 [requirement that bidders supply only steel manufactured in America invalid because unrelated to the goals of the bidding statutes]; accord, American Inst. for Imported Steel v County of Erie, 32 AD2d 231; Matter of Warren Bros. Co. v Craner, 30 AD2d 437 [requirement that bidders' asphalt plants be located in Onondaga County invalid]).
Read together, these cases identify two central purposes of New York's competitive bidding statutes, both falling under the rubric of promoting the public interest: (1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts. Generally, when a public entity adopts a specification in the letting of public work that impedes the competition to bid for such work, it must be rationally related to these twin purposes. Where it is not, it may be invalid (Associated Bldrs., 67 NY2d at 855, supra).
As applied particularly to PLAs, which are clearly different from typical prebid specifications in their comprehensive *69 scope, more than a rational basis must be shown. The public authority's decision to adopt such an agreement for a specific project must be supported by the record; the authority bears the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statutes. Judicial review, although limited, is not without importance in that it safeguards the interests protected by the competitive bidding mandate. PLAs may not be approved in a pro forma manner.
Mindful of these principles, we turn to the facts before us.

The Thruway Authority Case
Respondent Thruway Authority is a public benefit corporation created by a special act of the Legislature (L 1950, ch 143) and responsible for constructing and maintaining the New York State Thruway (see, Public Authorities Law § 352). In that connection the Authority had charge of a major construction project to improve the Governor Malcolm Wilson (Tappan Zee) Bridge.
Originally opened in 1955, the Tappan Zee Bridge spans the Hudson River between Rockland County on the west and Westchester County on the east. The Bridge carries Interstate Route 87, which extends north and west from Rockland County in the direction of Albany, Canada and Buffalo, and east and south to New England and New York City. Approximately 60,000 toll-paying vehicles flow across the Bridge daily  and tolls are collected only from eastbound traffic. In 1993, 20,647,930 toll-paying vehicles crossed the Bridge, generating $45,920,519 in revenue for the Thruway Authority.
At issue is a four-year project to refurbish the Tappan Zee Bridge  the largest such construction project since the Bridge was built. A significant portion of the work involves deck replacement, which entails reducing the number of lanes available to traffic while work is in progress. Thus, the Thruway Authority determined that efficiency in completing the project, once commenced, is important to protect a major revenueproducing asset, maximize public safety, and minimize inconvenience to the traveling public.
Of the 23 major construction projects on the Tappan Zee since it was built, the successful bidder in 20 was a union contractor. In fact, union contractors had performed more than 90% of the total dollar volume of work on the Bridge.
*70 Based on the size and complexity of the pending project, the Thruway Authority predicted that it would be subject to the jurisdiction of some 19 local unions with separate labor contracts having different starting times, scheduling restrictions, holidays, grievance resolution procedures, and other terms and conditions of employment. In 1992, the last time a contract was awarded to a nonunion contractor, the Tappan Zee's first labor dispute erupted. The dispute required the assistance of the State Police to insure the safety of the contractor's employees, and the Bridge itself was picketed.
After receiving an August 1993 memorandum from the Governor's office advising of the Boston Harbor decision and recommending consideration of PLAs for future projects, the Authority retained a consultant to investigate the issue for the Tappan Zee project. Based on concessions won from local unions, uniform scheduling and enhanced flexibility with work shifts, the consultant's detailed report estimated labor savings if a PLA were adopted of at least $6 million, or 13.51% of the anticipated labor cost for the project. Additionally, with a PLA, the Authority would maximize its ability to maintain toll revenues throughout the construction period. After months of negotiation, an agreement was signed and the Thruway Authority included the PLA in the bid documents
The PLA, which binds anyone working on the project, provides that the signatory unions shall be recognized as the exclusive bargaining representatives of all craft employees working at the project. The agreement incorporates the local collective bargaining agreements of the signatory unions and makes them binding on all successful bidders. It requires that contractors secure a minimum of 88% of their labor through the labor hall referral system (thus allowing contractors to retain up to 12% of their current work force). The PLA, however, prohibits discrimination in referrals on the basis of union affiliation.
Additionally, the PLA requires every employee and contractor, regardless of union affiliation, to pay union dues and contribute to employee benefit funds. It provides uniform work rules for all trades, establishing standard hours of work per day and per week. Finally, the PLA sets forth mandatory dispute resolution procedures and expressly prohibits strikes or other labor disruptions.
Immediately after the Thruway Authority issued its specifications, including the PLA, for bridge structural steel repairs, *71 appellants (trade organizations representing contractors and suppliers, a contractor, as well as two individuals claiming to represent the interests of taxpayers and tradespersons) commenced a CPLR article 78 proceeding seeking a declaration that the PLA was unlawful and illegal, and an order halting the bidding process. Unions representing the construction trades and an association of unionized construction employers intervened. Adopting the reasoning of New Jersey's Harms decision, Supreme Court concluded that the "policy of using PLA's contravenes two of the purposes of [the competitive bidding statutes] in discouraging competition by deterring nonunion bidders, and fostering favoritism by dispensing advantages to unions and union contractors."
The Appellate Division reversed, dismissed the petition, and declared that the Thruway Authority did not violate competitive bidding requirements: "Assuming that the use of the PLA somehow discourages competition in the bidding process * * * [w]e conclude that the Thruway Authority's decision to use the PLA at issue in this case is rationally based upon reasons in the public interest promoted by the competitive bidding statutes" (207 AD2d at 30-31). We agree.
Apart from a measure of independence explicitly delegated to the Thruway Authority (see, Public Authorities Law § 359 [1]; see also, Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth., 5 N.Y.2d 420), we note that in adopting a PLA the Authority assessed specific project needs and demonstrated that a PLA was directly tied to competitive bidding goals. Importantly, the PLA cannot be said to promote favoritism or cronyism because the PLA applies whether the successful bidder is a union or nonunion contractor and discrimination against employees on the basis of union membership is prohibited. The fact that certain nonunion contractors may be disinclined to submit bids does not amount to the preclusion of competition we identified in Gerzof as violative of the competitive bidding mandate.
The Thruway Authority's detailed focus on the public fisc  both cost savings and uninterrupted revenues  the demonstrated unique challenges posed by the size and complexity of the project, and the cited labor history collectively support the determination that this PLA was adopted in conformity with the competitive bidding statutes. Agreeing with the Appellate Division as to appellants' remaining contentions, we therefore affirm the order upholding the Thruway Authority's decision to use the PLA for the Tappan Zee project.

*72 The Dormitory Authority Case
At issue here is a PLA adopted by respondent DASNY, a public benefit corporation responsible for the financing and construction of facilities for State agencies and other entities for which the Legislature has given authorization (see, Public Authorities Law § 1677). Among its larger projects is the modernization of the Roswell Park Cancer Institute for the Department of Health, which operates the Institute. The Roswell project contemplated various public works projects on the Institute's 25-acre campus-like setting spanning a period of five years.
In August 1993, when DASNY received the Governor's office's memorandum regarding PLAs, it had already begun renovation and in fact had let several contracts in furtherance of the Roswell project through competitive bidding. After DASNY was approached by representatives of the Buffalo Building Construction Trades Council in the fall of 1993 regarding adoption of a PLA for the Roswell project, DASNY's Board of Directors discussed the possibility of a PLA, and the reaction was mixed. Among the negative factors noted were that a PLA might raise the over-all cost of the project; the possibility that skilled labor needed in subsequent project phases might not be available through the PLA; and that upstate, 50% or more of public construction work was nonunion. Barely two months later, local unions picketed two open shop contractors working at Roswell Park. Minutes of a subsequent DASNY Board meeting on February 23, 1994 continued to reflect Board skepticism concerning the need for a PLA at Roswell Park, including the observation that a PLA may affect the price of labor adversely, and made no mention of the picketing.
The following month DASNY approached a labor consultant regarding the issue of a PLA for the Roswell Park project. Of "suggested negotiating topics," none mentioned cost savings as a goal or provided any cost savings projections. The president of the Building and Construction Trades Council of Buffalo then sent a copy of their proposed PLA to DASNY's Executive Director and requested a meeting. The Executive Director responded that the Authority had not yet made a decision regarding a PLA, noting that
"[a]ccess of minorities and women to employment and contract opportunities on this project is a high priority of the Authority. Consequently, if we decide to pursue the negotiation of a project agreement *73 or request our construction manager to do so, you should know that our decision will be premised on an understanding that the resulting agreement will contain provisions facilitating those opportunities."
On April 14, 1994, negotiation of a PLA for the Roswell Park project commenced and weeks later the agreement at issue was concluded.
Not unlike the Thruway Authority PLA, DASNY's PLA made local collective bargaining agreements of each signatory union binding on all successful bidders; signatory unions were to be recognized as the exclusive bargaining representatives of all craft employees working at the project; contractors were required to hire employees exclusively through the local union job referral system (nonunion contractors were permitted to retain one "core" employee, up to a limit of 10, for every employee hired from the union job referral system). Additionally, all employees hired had to pay union dues and contractors were required to make contributions to union employee benefit funds. Where applicable, a contractor's choice of materials, design, tools or labor-saving devices was limited by local collective bargaining agreements, and the PLA provided uniform work rules for all trades, establishing standard hours of work per day and per week. Lastly, the PLA set forth mandatory dispute resolution procedures, expressly prohibiting strikes or other labor disruptions.
Appellants (seven contractor associations and two general contractors from the Buffalo area) commenced an article 78 proceeding seeking invalidation of the PLA. Supreme Court stayed acceptance of Roswell Park bids while the merits of the petition were considered. Thereafter, the court annulled the PLA as violative of the competitive bidding requirements of State Finance Law § 135 and Public Buildings Law § 8. The Appellate Division reversed, holding that as in the Thruway Auth. case the PLA at issue did not violate the competitive bidding statutes because a diminution in competition was permissible, its purpose being rationally related to the public interest promoted by competitive bidding. Disagreeing with that application of the governing principles, we now reverse.
Pursuant to Public Health Law § 2420 (read in conjunction with State Finance Law § 127 [2]), contracts involving the Roswell Park project must comply with the requirement in Public Buildings Law § 8 that the awards be made to the lowest *74 responsible and reliable bidder as will best promote the public interest. Additionally, in 1989, the Legislature amended Public Authorities Law § 1680 (2) (a) to require that:
"[A]ny contract undertaken or financed by the dormitory authority for any construction, reconstruction, rehabilitation or improvement of any building commenced after January first, nineteen hundred eighty-nine for the department of health shall comply with the provisions of section one hundred thirty-five of the state finance law."
State Finance Law § 135 mandates that construction contracts be awarded to the "lowest responsible bidder."
Notwithstanding these requirements, DASNY, like the Thruway Authority, is a public benefit corporation. And as we noted in Schulz v State of New York (84 N.Y.2d 231, 244) public benefit corporations were devised by the Legislature to separate their administrative and fiscal functions from those of the State in order to protect the State from liability and enable public projects to be carried out with a measure of freedom and flexibility. Thus, DASNY's status would allow it to adopt a PLA  provided it satisfied its burden of showing that adopting such an agreement was consistent with the principles underlying the competitive bidding statutes. While the range of discretionary authority granted to a public entity is a factor in determining the validity of a particular PLA, that factor is not dispositive here.
What is dispositive is that the record fails to show that DASNY's decision to enter into the PLA had as its purpose the advancement of the interests underlying the competitive bidding statutes.
Glaringly absent from this record is DASNY's contemporaneous projection of cost savings as a result of a PLA or any unique feature of the project which necessitated a PLA, an exceptional specification in all events. Although the record contains a few paragraphs identifying how costs would increase if project construction were delayed for one to three months, these projections  apparently done by DASNY's labor consultant in response to the instant litigation  appear in an affidavit submitted to the trial court nearly four months after the PLA was approved. In fact, by the time of the PLA, DASNY had already let up to six contracts through competitive bidding on the project with no evidence of reduced efficiencies. Minutes of the DASNY Board through the winter continued to reflect the Authority's own doubt that a PLA was needed.
*75 Nor does the record demonstrate labor unrest threatening the project. DASNY's resolution and Board discussions do not even discuss labor unrest, except to mention it was not a concern. Although there is reference in the record to one incident of labor unrest  coinciding with DASNY's consideration of a PLA at Roswell Park and ending with the signing of the PLA  that activity was not claimed to have affected work performance. Rather, the record reflects that local groups used the Roswell Park project as an opportunity to lobby for or against a PLA.
Post hoc rationalization for the agency's adoption of a PLA cannot substitute for a showing that, prior to deciding in favor of a PLA, the agency considered the goals of competitive bidding. To say that DASNY's adoption of the PLA is justified simply by its desire for labor stability so that the work will be completed on time is tantamount to wholesale approval of PLAs  every public entity wants its projects completed on time, and public projects are presumptively important to the public. The competitive bidding requirements, however, demand that something more be shown in order to justify the significant restrictions imposed by PLAs.
Moreover, DASNY's emphasis on its goals of promoting women and minority hiring through the PLA, although surely laudable, is unrelated to the goals of the competitive bidding statutes and cannot support its adoption of the PLA for this project (see, Associated Bldrs., supra; American Inst. for Imported Steel, supra).
Given the record, the PLA in this instance cannot be sustained.

Response to the Dissent
Placing preclusive preeminence on a policy of free competition, the dissent would prohibit PLAs without specific legislative direction, however strong the showing that for a particular project such an agreement in fact served the public interest. New York law, of course, has never insisted upon unfettered competition in the letting of public contracts (see, at 67-68, supra). And even the New Jersey Supreme Court, which in Harms concluded that its own State's competitive bidding statutes required unfettered competition, recognized the Thruway Authority PLA as "exemplif[ying] the exceptional circumstances that could justify recourse to a PLA" (Tormee Constr. v Mercer County Improvement Auth., 143 NJ 143, 149, 669 A2d 1369, 1372).
*76 Nor do PLAs generically represent a social policy favoring organized labor (dissenting opn, at 83). The Thruway Authority PLA, for example, recognized that the successful bidder need not be a union contractor; it recognized that the unions must comply with the terms of the PLA whether or not the successful bidder was a union contractor; and it prohibited discrimination against prospective employees on the basis of union membership. PLAs that do have as their purpose social policymaking, such as remedying racial and gender bias, will not be sustained (see, e.g., Subcontractors Trade Assn. v Koch, 62 N.Y.2d 422 [set-aside program for locally based enterprises]; Matter of Fullilove v Beame, 48 N.Y.2d 376 [affirmative action plan]).
Furthermore, the dissent's claim that a PLA's anticipated cost savings are somehow illusory because "organized labor drives the cost of a project up [and] PLAs bring it back down" (dissenting opn, at 87) has no support in the record. Indeed, the Thruway Authority record shows the contrary: that over the years, under our competitive bidding laws, the successful bidders for Tappan Zee projects overwhelmingly have been union contractors. That a PLA might reduce costs as the result of negotiations with organized labor does not render such savings "illusory." And since the anticipated savings would be achieved under the PLA whether or not the successful bidder actually is a union contractor, there is no issue of favoritism.
Because PLAs do not generically constitute policymaking, because some freedom and flexibility have been delegated to public benefit corporations, and because the particular interests embodied in New York's competitive bidding statutes have long been clearly articulated as standards for agency action, the separation of powers doctrine is not implicated here (dissenting opn, at 91; see, Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 N.Y.2d 398, 410).[*]
In sum, the Court's test neither rubber-stamps nor rejects PLAs wholesale. Rather, it looks to the concerns underlying the competitive bidding statutes to ensure that contracting authorities can respond to the challenges of exceptional construction projects while remaining faithful to the protections provided to the public by the competitive bidding laws. Illustrated *77 by two practical applications, the test should enable public project owners to continue to serve the public interest by proceeding effectively at their work sites, instead of litigating in the courts.
Accordingly, the order of the Appellate Division in Matter of New York State Ch. v New York State Thruway Auth. should be affirmed, with costs. The order of the Appellate Division in Matter of General Bldg. Contrs. v Dormitory Auth. of State of N. Y. should be reversed, with costs, and Supreme Court's judgment reinstated.
SMITH, J. (dissenting in Matter of New York State Ch. v New York State Thruway Auth.). Because the Legislature should decide whether New York State's public authorities may condition awards of public works contracts upon a successful bidder's adoption of a Project Labor Agreement (PLA), I dissent, in part, and would reverse the order of the Appellate Division in the Thruway Authority case as well as in the Dormitory Authority case.
The Thruway Authority and the Dormitory Authority are public benefit corporations created by the Legislature through the Public Authorities Law (see, Public Authorities Law § 352 [creating the Thruway Authority]; Public Authorities Law § 1677 [creating the Dormitory Authority]). The Thruway Authority exercises jurisdiction over a section of the New York State Thruway which includes the Tappan Zee Bridge (Bridge) (Public Authorities Law § 356 [2]). The Dormitory Authority, the contracting agency for the New York State Department of Health, is authorized by statute to act as the contracting agency for the Roswell Park Cancer Institute (Roswell Park) because the institute falls under the Department of Health (Public Authorities Law § 1680 [1], [2] [a]; Public Health Law § 2420).
In a memorandum dated August 17, 1993, the Governor's office asked all State construction agencies and authorities to consider the benefits of using prehire or project labor agreements, which "typically require all contractors and subcontractors on a [construction] project to use a designated source for all construction workforce hiring, typically union hiring halls." The memorandum had its genesis in Building & Constr. Trades Council v Associated Bldrs. & Contrs. of Mass./ R. I. (507 US 218), the Boston Harbor case, decided by the United States Supreme Court in 1993.
The Governor's memo, in addition to stating that the Boston Harbor case permitted a State, acting as a consumer in the *78 construction industry marketplace, to require PLAs as a condition of awarding a public works contract, also stated:
"All State agencies, authorities and other entities should consider on a case-by-case basis the possible use of such agreements when acting in the role of a market participant for construction projects. * * * I ask that all State construction agencies and authorities evaluate the benefits, for appropriate projects, of negotiating a pre-hire agreement, either directly or through a construction manager or general contractor as an agent, with the State or regional Building and Construction Trades Council."
The Thruway Authority and the Dormitory Authority received copies of the Governor's memorandum and the document influenced both Authorities to consider using PLAs in pending and anticipated construction projects involving the Bridge and Roswell Park.
In 1994, the Thruway Authority authorized the negotiation of a PLA for the rehabilitation and reconstruction of the Bridge, a project expected to total approximately $130 million (Matter of New York State Ch., Inc., Associated Gen. Contrs. v New York State Thruway Auth., 167 Misc 2d 572). The same year, the Dormitory Authority authorized a PLA for various construction projects involving the renovation and modernization of Roswell Park for the New York State Department of Health. The Roswell Park PLA was projected to cover approximately $170 million worth of construction. PLAs were subsequently negotiated and executed by construction managers for the Thruway Authority and the Dormitory Authority, and successful bidders were required to adopt the applicable PLA's terms as a condition of being awarded a construction contract for a Bridge or Roswell Park project.
The Bridge Project
Over the years, the Bridge has undergone various repairs. Specifically, during a 24-year period, 23 construction contracts were let by the Thruway Authority. Of the 23 contracts awarded, 20 of the successful bidders were union contractors. The goals for the Bridge PLA, set forth in the preamble to the agreement, seek the timely, efficient and successful completion of Bridge repairs through (1) avoidance of delays through strikes, slowdowns and other disruptions; (2) standardization of the terms and conditions governing work; (3) flexibility in work *79 schedules; (4) negotiated adjustments to work rules and staffing requirements; (5) provisions for the settlement of work disputes, including those related to jurisdiction; (6) a reliable source of skilled and experienced labor; (7) improved opportunities for minorities, women and the economically disadvantaged; (8) minimization of lost toll revenues; and (9) expedition of the construction process and minimization of traffic inconvenience for Bridge users.
The Roswell Park Projects
Roswell Park is a cancer research and treatment center consisting of 18 buildings in a 25-acre area located in downtown Buffalo. As 1 of 27 Comprehensive Cancer Centers designated by the National Cancer Institute, many of the services provided by Roswell Park have long waiting lists. The modernization and renovation effort was spurred by the need to expand existing services, create and deliver new services, and to install a more modern air handling system.
The Dormitory Authority authorized the PLA for the Roswell Park construction projects in order to (1) obtain a reliable source of labor, (2) ensure labor harmony over the course of the projects, and (3) standardize the terms and conditions of work. The need to avoid delays in construction was cited as a primary concern because cancer patients would be at a higher risk of infection by airborne organisms during construction, and because delays would mean fewer cancer patients receive treatment.
The Project Labor Agreements
A detailed review of the PLAs is necessary in order to fully appreciate the preference given unions and thus, the various policy issues raised by the public authorities' utilization of them. The PLAs in these two cases contain only minor differences and are alike in all material aspects. The Bridge PLA involves some 19 different labor agreements, with each expiring at least once during the period of reconstruction. The Roswell Park PLA involves some 21 agreements involving 15 different unions, with each expiring at least once during the period of the project. Both PLAs institute a mandatory labor referral system, operated by the signatory unions, which all successful bidders and their subcontractors (collectively referred to as contractors) must use in obtaining a similarly defined class of employees to directly perform construction and construction-related work. The unions must administer the referral system without offending any laws or regulations, and *80 in a nondiscriminatory manner. The PLAs also explicitly prohibit the unions from discriminating against workers in the operation of the referral system on the basis of union or nonunion membership, or any aspect of union membership.
The PLAs require all contractors to hire the vast majority of covered employees through the union referral systems; nonunion contractors may hire some employees and apprentices outside the referral systems, but the PLAs strictly limit their ability to do so both quantitatively and procedurally. Contractors under both PLAs must recognize the signatory unions as the "sole and exclusive" bargaining representatives for the employees covered by the agreements. The contractors must also make contributions to certain employee benefit funds established and maintained by the unions. Nonunion affiliated workers hired under the PLAs must make payments to the signatory unions which union members already pay as union dues. These payments are intended to reimburse the unions for acting as the workers' bargaining agents, an assignment mandated by the PLAs since contractors may not recognize any other bargaining representative for the covered employees.[1] While the Bridge PLA permits employees to merely pay an agency shop fee, the Roswell Park PLA requires all employees to become union members, though they may limit their membership to "financial core membership."
Both PLAs also provide that the unions will not strike, picket, conduct work stoppages, or otherwise engage in "disruptive" activity for "any reason." Failure of workers employed under the PLAs to cross a picket line by a signatory or nonsignatory union constitutes a violation of the applicable PLA. Contractors may not lock out any employees hired pursuant to the PLAs.
The Applicable Competitive Bidding Statutes
Unlike actors and projects in private sector construction, the Authorities and public works projects here are subject to competitive bidding statutes. The Thruway Authority is governed by Public Authorities Law § 359, which requires that contracts for construction, reconstruction and maintenance of the New York State Thruway, of which the Bridge is a part:

*81 "be let to the lowest responsible bidder, by sealed proposals publicly opened, after public advertisement and upon such terms and conditions as the authority shall require" ( 359 [1]).
Because Roswell Park falls under the jurisdiction of the Department of Health, all contracts for the construction, alteration, repair or improvement of Roswell Park facilities must comply with Public Buildings Law § 8 (State Finance Law §§ 125, 127). Section 8 (6) of the Public Buildings Law requires that:
"All contracts for amounts in excess of five thousand dollars for the work of construction, reconstruction, alteration, repair or improvement of any state building, whether constructed or to be constructed must be offered for public bidding and may be awarded to the lowest responsible and reliable bidder, as will best promote the public interest."
Furthermore, in 1989, the Legislature amended section 1680 (2) (a) of the Public Authorities Law to provide that:
"[A]ny contract undertaken or financed by the dormitory authority for any construction, reconstruction, rehabilitation or improvement of any building commenced after January first, nineteen hundred eighty-nine for the department of health shall comply with the provisions of section one hundred thirty-five of the state finance law."
Section 135 of the State Finance Law also requires that construction contracts for specified work be awarded:
"separately to responsible and reliable persons, firms or corporations engaged in these classes of work. A contract for one or more buildings in any project shall be awarded to the lowest responsible bidder for all the buildings included in the specifications."
These various competitive bidding statutes have, as noted by the majority, two common purposes:
"(1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts." (Majority opn, at 68.)
*82 A low bid may be rejected for a good reason, but the "power to reject any or all bids may not be exercised arbitrarily or for the purpose of thwarting the public benefit intended to be served by the competitive process" (Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 N.Y.2d 144, 149). Thus, the directive to promote the public interest may not be viewed in isolation, without regard to the full range of fiscal implications, as well as the anticompetitive effects which may result. The question, as we view it, is whether the competitive bidding statutes authorize public authorities to use PLAs to limit the pool of those who will be considered "responsible bidders."
Separation of Powers, PLA Favoritism, and Policy Choices
The decision to favor union over nonunion contractors reflects a policy decision which should have been reserved to the Legislature.
"Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator. * * * An agency cannot by its regulations effect its vision of societal policy choices [citations omitted] and may adopt only rules and regulations which are in harmony with the statutory responsibilities it has been given to administer" (Matter of Campagna v Shaffer, 73 N.Y.2d 237, 242-243).
"Private employers in this State are free to make employment decisions on whatever basis they choose, as long as the basis is not prohibited by law" (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 N.Y.2d 344, 359). Here, we have public authorities which are statutorily obligated to let contracts to the lowest bidder. But by their very nature, the PLAs may interfere with that obligation because they may cause the "lowest" bids to be inflated by the costs of organized labor, and because the most "responsible" bidder may be one who does not utilize organized labor. The conclusion that particular labor practices best advance certain objective goals is a policy determination best left to the Legislature (see, Boreali v Axelrod, 71 N.Y.2d 1 [striking a balance between competing interests, various businesses, and the general public on the basis of political, social and economic, rather than technical factors is more appropriately made by the Legislature instead of the Public Health Council]).
Indeed, the determination that prehire or Project Labor Agreements are permissible as a matter of Federal law was *83 reached by Congress, a legislative body, and not by the executive branch of the Federal Government (see, 29 USC § 158 [e], [f]). The Boston Harbor case, which provides the background for these appeals, involved the judicial interpretation of a Federal statute which expressly authorized PLAs, and contained no State law issues. In contrast, the New York State Legislature has not provided a broad grant of authorization for PLAs analogous to congressional amendment of the National Labor Relations Act, and the policies of competitive bidding statutes in promoting competition and discouraging favoritism in the competitive bidding process are at odds with the effect of PLAs. Whether PLAs may be required by the State as a purchaser of construction services absent specific legislative authorization requires the balancing of competing policy interests best left to the legislative branch of government.[2]
Moreover, the majority's reliance on Northern Ohio Ch. of Associated Bldrs. & Contrs. v Gateway Economic Dev. Corp. (1992 WL 119375 [ND Ohio, May 12, 1992]) and Utility Contrs. Assn. v Department of Pub. Works (29 Mass App Ct 726, 565 NE2d 459 [1991]) as evidence that other courts have recognized the "efficiencies to be gained" through the use of PLAs (see, majority opn, at 65) is misplaced. In Northern Ohio Ch., plaintiff sought an injunction against the PLA requirement imposed by the Gateway Economic Development Corporation of Greater Cleveland on four Federal law grounds and two State law grounds (violation of Ohio's Public Bidding Statute and violations of the Ohio State Constitution). The District Court dismissed the Federal claims on the ground that Gateway was not a State actor, and declined to retain jurisdiction over the pending State law claims. The court did not address the benefits or efficiencies to be gained from using PLAs. The court in Utility Contrs. dismissed the case as moot because the Department of Public Works stated that it did not intend to issue the contested bid specification which required contractors to execute a PLA as a condition of accepting bids.
The majority contends that the separation of powers doctrine is not implicated in these appeals because competitive bidding statutes provide sufficient guidance for agency action (majority opn, at 76). However, we have repeatedly held that absent a specific grant of legislative authority, a governmental *84 body may not use its contracting power to implement an extrinsic social policy by requiring the adoption of specified labor practices (see, Matter of Broidrick v Lindsay, 39 N.Y.2d 641 [Mayor not authorized to require certain minority percentages of employment by construction contractors in enforcing nondiscrimination statutes]; Matter of Fullilove v Beame, 48 N.Y.2d 376 [New York City may not implement the goal of non-discrimination by requiring contractors to adopt an affirmative action program as a condition of contracting with the city]; Subcontractors Trade Assn. v Koch, 62 N.Y.2d 422 [Mayor may not require that 10% of all construction contracts awarded by the city be given to locally based enterprises in order to promote the development of businesses and opportunities in economically depressed areas]; Under 21, 65 N.Y.2d 344, supra [Mayor may not enforce laws prohibiting employment discrimination by prohibiting those who secure contracts with the city from refusing to hire people on the basis of sexual orientation or affectional preference]). As in the foregoing cases, the competitive bidding statutes provide the general directive to award contracts to the lowest responsible bidder, but do not authorize the particular remedy which the Authorities seek to implement here. Indeed, by balancing the competing interests in this case, without statutory authorization, the majority engages in the kind of policy making properly reserved to the Legislature.
We recognize that unlike the New Jersey competitive bidding statute at issue in Harms Constr. Co. v New Jersey Turnpike Auth. (137 NJ 8, 644 A2d 76), New York State's competitive bidding statutes do not promote "unfettered competition" and we do not urge that interpretation of our statutes here. Moreover, the fuller description of New Jersey's competitive bidding statutes provided by the New Jersey Supreme Court in Tormee Constr. v Mercer County Improvement Auth. (143 NJ 143, 669 A2d 1369), indicates that, similar to New York law, New Jersey requires all contracts requiring public advertisement for bids be awarded to the "lowest responsible bidder" (see also, NJ Stat Annot § 40A:11-6.1).
The New Jersey Supreme Court also invalidated the PLA in Tormee because no "exceptional circumstances," which the court believed had been demonstrated in the Thruway Authority case, justified the PLA's anticompetitive effects. However, even in reaching this holding, the Tormee court stated:
"[W]e recognize that the Legislature is better suited *85 than the judiciary to determine `the size, complexity and cost' of projects that justify recourse to a PLA. New York Thruway, supra, 620 N.Y.S.2d at 856, 207 AD2d 26. We also believe that the Legislature is better suited to accommodate the several interests of labor, management, and the public. Harms, supra, 137 N.J. at 45" (143 NJ, at 150-151, 669 A2d, at 1373, supra).
It is important to note that the PLAs were negotiated without the input of any spokesperson for nonunion contractors or nonunion labor. The terms of the Bridge PLA were reached after approximately four months of negotiations between the Thruway Authority construction manager and various union representatives. The Roswell Park PLA was negotiated between the Dormitory Authority construction manager, local unions affiliated with the Buffalo Building Trades Council, and four other unions. Apart from the construction managers acting on behalf of the authorities, no representatives of nonunion interests were present at any of the negotiation sessions which resulted in the PLAs at issue here.
The majority freely concedes that "[b]y comprehensively requiring all bidders to conform to a variety of union practices and limiting their autonomy to negotiate employment terms with a labor pool that includes nonunion workers", the PLAs create anticompetitive effects (majority opn, at 65). Nevertheless, the majority contends that the PLAs do not promote "favoritism or cronyism" because the agreements apply to all contractors, both union and nonunion, and discrimination against employees on the basis of union membership is prohibited.
The Bridge and Roswell Park PLAs decrease competition because they impermissibly favor union contractors over nonunion contractors. Favoritism can take many forms, and the fact that no contractor has been prohibited outright from submitting a bid does not conclusively demonstrate fairness of the bidding process. If the apparently neutral terms of the PLAs skew the competition in favor of union contractors over nonunion contractors, it is immaterial that both groups may become parties to the agreements.
Prior to the PLAs, bidders for Bridge or Roswell Park projects had the ability to compete directly for a pool of labor which included both union and nonunion workers. Contractors could enter into collective bargaining agreements and obtain union *86 affiliated employees, or, contractors could negotiate directly with workers for their services. In contracting directly with nonunion workers, contractors had the ability to independently negotiate the terms of employee benefit plans and the tasks each worker would be required to perform. Contractors could also choose employees on the basis of their familiarity with a particular management team and the contractor's business practices, and on the basis of an employee's prior work history with the contractor.
The PLAs systematically render every advantage to unions and union-affiliated workers. The only successful bidders who lose their ability to staff their work crews in accordance with their prior practice are nonunion contractors. Union contractors, who are already familiar with and use union hiring halls do not suffer any disruptions in their business routines. Moreover, the limited number of workers which contractors may employ outside of the union referral process provides only limited relief from the intrusive impact of the PLAs.[3] Furthermore, since employees hired outside the referral systems must satisfy certain requirements, nonunion contractors also incur additional administrative costs in attempting to retain their employees.[4]
The PLAs also require nonunion contractors to adopt a variety of union practices which place them at a disadvantage with contractors already familiar with jurisdictional rules of various unions and the requirements of local collective bargaining agreements. As the majority notes, the Bridge PLA "incorporates the local collective bargaining agreements of the signatory unions and makes them binding on all successful bidders" (majority opn, at 70); the Roswell Park PLA contains similar provisions. The PLAs also require nonunion contractors to relinquish any savings they may realize from directly negotiating terms of employment with workers since the unions must be recognized as exclusive bargaining agents.
Respondents contend, and the majority accepts, that PLAs protect the public fisc and that a public authority  in support of its decision to utilize a PLA  need point only to an *87 anticipated cost savings and experience with labor unrest, as the Thruway Authority has done. But this ignores the fact that nonunion contractors may be able to submit substantially lower bids if they are not required to comply with a PLA. Moreover, the anticipated savings to the public project are directly attributable to the elimination of the costs of organized labor and labor unrest, or, as the majority notes, "concessions won from local unions" (majority opn, at 70). Viewed another way, organized labor drives the cost of a project up; PLAs bring it back down. Thus, the savings from the PLA are, in essence, artificial and illusory. Viewed in such a light, it cannot be seriously argued that public authorities' endorsement or utilization of PLAs to appease labor unions is not fundamentally a matter of social policy. As such, it is an issue that should be addressed by the Legislature.
In addition to creating illusory cost savings, the PLAs are in direct contravention of the second purpose of the competitive bidding statutes  to avoid favoritism in the letting of public contracts. True, this is not a situation in which a single bidder has been favored (compare, Gerzof v Sweeney, 16 N.Y.2d 206), and though the favoritism of PLAs may be rationally explained, it is nevertheless manifestly contrary to the second purpose of the competitive bidding statutes. And it is all the more offensive to the competitive bidding statutes because favoritism following from PLAs directly promotes and inflates the artificial cost savings used to support the decision to utilize a PLA in the first instance.
Further, the PLAs turn the concept of competitive bidding upside down. Our jurisprudence reflects that lowest responsible bidders are usually selected by encouraging the most competition to obtain the lowest bid, and then determining whether the lowest bidder is responsible. PLAs, however, operate on the implicit and irrebuttable presumption that a bidder is responsible only if it is a union contractor. But the requirement that a bidder be responsible cannot be used to decrease competition at the commencement of the bidding process so that the range of bids is artificially restricted and inflated.
Although ensuring labor peace may be a legitimate purpose of entering into a PLA, given proper authorization by the Legislature, we have never held, and the Legislature has never stated that ensuring labor peace is a legitimate purpose of New York State's competitive bidding statutes. Indeed, our jurisprudence holds that rejection of a low bid from a nonunion contractor solely because of fear that protest by unions would *88 delay construction violates New York's competitive bidding statutes (see, Matter of M. Cristo, Inc. v State of New York Off. of Gen. Servs., 42 AD2d 481, cited with approval in Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 N.Y.2d 144, 148; Matter of Long Is. Signal Corp. v County of Nassau, 51 Misc 2d 320).
Appeasing unions through favorable treatment in order to ensure labor peace is antithetical to the idea of open and honest competition and does not further the goal of obtaining lowest responsible bidders. Absent statutory authorization, it is irrational to permit the use of PLAs to hold bidders accountable for the conduct of third parties in the guise of seeking "responsible" contractors, since contractors should only be held responsible for their own conduct. Nothing in the history of the competitive bidding statutes suggests that favorable treatment of unions is permissible because of organized labor's ability to cause labor unrest by protesting a bidder's lawful labor practices; indeed precedent suggests otherwise.
It is clear from the foregoing that the PLA requirements at issue here cannot be equated with neutral bid specifications such as the use of a particular grade of building materials. Indeed, it is difficult to distinguish this case from Associated Bldrs. & Contrs. v City of Rochester (67 N.Y.2d 854) where an association of nonunion contractors challenged a city ordinance which established a preference for workers who participate in State-approved apprentice programs. Although support for apprenticeship training would arguably have promoted the goal of securing a responsible bidder by ensuring a skilled workforce, we invalidated the preference as being unsupported by the specific goals of competitive bidding statutes.
Public Benefit Corporations
The majority suggests that only public authorities, by virtue of their status as public benefit corporations, may enter into PLAs because they have been granted a measure of flexibility and independence not provided to other agencies. However, the majority's reliance on Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth. (5 N.Y.2d 420, 422), where we permitted the Thruway Authority to issue specifications for "construction, plumbing, heating and ventilating, electrical and site development work" to be performed in a single contract, instead of the separate contracts called for by State Finance Law § 135, is unwarranted. The interpretation of "lowest responsible bidder" or *89 the standards for determining the lowest responsible bidder were not at issue in that case and we did not hold, or even suggest, that public authorities had greater flexibility than other agencies in awarding contracts.
Moreover, the executive branch has a stated policy of requiring the Thruway Authority and the Dormitory Authority, as contracting agencies for New York State, to employ the same standards as other contracting agencies in determining "responsible and reliable" bidders. Recognizing that "it is the established policy of the State of New York to award certain contracts to the lowest responsible and reliable bidder as will best promote the public interest," Governor Cuomo issued guidelines, in 1993, to all contracting agencies for determining the responsibility of bidders (9 NYCRR 4.170). The guidelines, promulgated by Executive Order because "the public interest would be served by the uniform application" of competitive bidding standards, apply not only to the public authorities here, but to agencies which are not public benefit corporations such as the Office of General Services (created by Executive Law § 200), the Department of Transportation (created by Transportation Law § 11), the Department of Environmental Conservation (continued in existence by ECL 3-0101), and the Office of Parks, Recreation and Historic Preservation (continued in existence by PRHPL 3.03). Thus, distinguishing between public authorities and other agencies by vesting public benefit corporations with additional discretion to authorize PLAs also creates anomalies in executive branch enforcement policies.
Moreover, recent legislative activity indicates that the Legislature has considered, and acted where action was deemed necessary to permit consideration of employees' labor affiliation in awarding public works contracts. In 1988, the Legislature created the New York City School Construction Authority. The new legislation permitted the Authority to suspend competitive bidding upon certain conditions, for various construction contracts, notwithstanding the provisions of Public Buildings Law § 8, State Finance Law § 135, General Municipal Law § 103, or of provisions in general, special or local law, charter or administrative code (Public Authorities Law § 1734).[5]
*90 Section 1735 of the Public Authorities Law, also enacted in 1988, and applying only to contracts involving (a) plumbing and gas fitting; (b) steam heating, hot water heating, ventilating and air conditioning apparatus; and (c) electric wiring and standard illuminating fixtures,[6] provides, in relevant part:
"In awarding contracts pursuant to this section the authority shall, in addition to [other factors] * * * consider the following factors when establishing a list of pre-qualified bidders for construction work: (a) the degree to which a contractor or subcontractor utilizes employees who are represented by a labor organization; (b) the absence of any intentional misrepresentation with regard to lists of subcontractors previously submitted * * * and (c) the record of the bidder in complying with existing labor standards, maintaining harmonious labor relations and recognizing state approved apprentice programs" (Public Authorities Law § 1735 [5]).
Section 1735 also creates a committee (composed of two representatives of the Authority, one representative from the Board of Trustees of the Authority, two representatives from construction-related labor organizations and two representatives from the construction industry), to "review and report on the contracts issued pursuant to this section and on the procedures and methodology of the authority in awarding such contracts" (Public Authorities Law § 1735 [4]). Originally scheduled to expire on June 30, 1994, section 1735 was amended in 1994 to extend the date of expiration to June 30, 1999. During the 1993-1994 session, the Legislature also considered requiring the State, as a purchaser of goods and services, to consider whether a contractor had entered into a bona fide collective bargaining agreement with its workers (see, 1993 NY Senate-Assembly Bill S 5902, A 8454).
The factual distinctions drawn by the majority to support its differing results in the Thruway Authority and Dormitory Authority cases are immaterial to the question of whether the PLAs conflict with the purposes of the competitive bidding statutes and whether utilization of PLAs is a matter of social policy best left to the Legislature. Indeed, the ultimate irony of the majority's project-specific and fact-bound inquiry into whether "the decision to enter into the PLA had as its purpose *91 and likely effect the advancement of the interests embodied in the competitive bidding statutes" is this: any cost savings or timeliness in completing a public works project that is anticipated by the use of a PLA will be offset by the costs and interruptions of the CPLR article 78 litigation that will be commenced to challenge every public project in which a PLA is required as a bid specification. Such a paradox can be avoided by acknowledging the policy implications and myriad factual considerations involved in the use of PLAs in public works, and permitting such decisions to be authorized, informed, and guided by legislative action taken pursuant to that body's power to make policy choices and enact laws to effectuate them (see, Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 N.Y.2d 398, 410).
Given the Legislature's demonstrated interest and involvement in the issues currently before this Court, any judicial or executive determination that the State, acting in its proprietary capacity, may require PLAs, is an unwarranted intrusion on the legislative process. Given the competing political, social and economic policies at stake, and the ability of the Legislature to engage in broad fact-finding hearings to determine the best interests for the State, the issue of whether PLAs may be required in public works projects is properly within the province of the Legislature.
In Matter of New York State Ch. v New York State Thruway: Order affirmed, with costs.
In Matter of General Bldg. Contrs. v Dormitory Auth.: Order reversed, with costs, and judgment of Supreme Court, Albany County, reinstated.
NOTES
[*] The dissent observes that New York has no analog to the NLRA exemption regarding PLAs (dissenting opn, at 83). The NLRA had invalidated pre-hire agreements, however, and Congress thus passed an exemption explicitly allowing PLAs in the construction industry. Since New York never restricted the use of PLAs, there can be no cogent reason why the New York Legislature has to pass similar legislation.
[1] Because these appeals may be resolved on other grounds, we need not address the argument of the appellants in the Thruway Authority case that the Bridge PLA violates article I, § 17 of the New York Constitution which provides, in part, "Employees shall have the right to organize and to bargain collectively through representatives of their own choosing."
[2] Although the majority notes that New York has never prohibited PLAs (majority opn, at 76, n), the central point, that Federal labor policy regarding PLAs has been formulated by Congress, the legislative branch of Government, remains unanswered by the majority.
[3] The Bridge PLA limits the hiring of employees outside of the referral system to a maximum of 12% per craft. The Roswell Park PLA provides that no more than 10 core employees may be hired for each craft and only in a one to one ratio with union referred workers until the maximum is reached.
[4] A Bridge contractor must submit a name to a three-person committee charged with the duty of determining whether that person is "qualified." A Roswell Park contractor may only retain "core" employees.
[5] However, section 1734 (1) (b) provides that the School Construction Authority is subject to General Municipal Law § 101, which requires separate specifications for certain types of construction work (Public Authorities Law § 1734 [1] [b]).
[6] Section 1735 also exempts the School Construction Authority from General Municipal Law § 101, which covers the same type of work.