KAISER *v.* PRICE-FEWELL, INC.

5-2671                                   359 S. W. 2d 449

Opinion delivered June 4, 1962.

[Rehearing denied September 10, 1962.]

*Warren & Bullion,* for appellant.

*Mehaffy, Smith & Williams,* by *William H. Sutton* and *B. S. Clark,* for appellee.

JIM JOHNSON, Associate Justice. This appeal questions the validity of an injunction against picketing in a labor dispute in North Little Rock. Appellants urge that members of the International Brotherhood of Electrical Workers, Local 295, have been denied their right of peaceful picketing pursuant to a strike directed against appellee. The Chancellor granted the injunction on the ground that the union was picketing for unlawful objectives, first, to obtain a contract with appellee which contains a hiring hall arrangement, and second, for a closed shop. Both of these objectives were found to violate Amendment 34 to the Arkansas Constitution and Act 101 of the Acts of 1947, which is the enabling act for enforcement of Amendment 34.

Suit for injunction was brought by appellee, Price-Fewell, Inc., against Paul Kaiser, individually and as Representative of International Brotherhood of Electrical Workers, Local 295, and R. L. Webb who is the International Representative of the Electrical Workers.

In September 1961, representatives of the union served notice on appellee that they represented a majority of its employees and requested that appellee negotiate a collective bargaining agreement with the union. Appellee refused and thereafter 14 of its employees went out on strike. The parties then commenced negotiations and several conferences were held. At one of the conferences the union presented appellee with a proposed basic contract, part of which was a contract termed ''Inside Agreement''. This agreement was executed by this union and members of the Ark. Chapter, National Electrical Contractors Association. Article V thereof sets forth a job referral procedure as follows:

''In the interest of maintaining an efficient system of production in the industry providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interests of the employees in their employment status within the area and eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree

to the following system of referral of applicants for employment.

"1. The Union shall be the sole and exclusive source of referrals of applicants for employment.

"2. The Employer shall have the right to reject any applicant for employment.

"3. The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, by-laws, constitutional provisions or any other aspects of obligation of union membership policies or requirements. All such selections and referral shall be in accordance with the following procedure.

"4. The Union shall maintain a register of applicants for employment established on the basis of the groups listed below. Each applicant for employment shall be registered in the highest priority group for which he qualifies.

"*GROUP I*: All applicants for employment who have four (4) or more years experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Local Union of the I. B. E. W. and who have been employed for a period of at least one (1) year in the last four (4) years under a collective bargaining agreement between the parties to this Agreement.

"*GROUP II*: All applicants for employment who have four (4) or more years' experience in the trade and who have passed a journeyman's examination given by a duly constituted Local Union of the I. B. E. W.

"*GROUP III*: All applicants for employment who have two (2) or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market and who have been

employed for at least six (6) months in the last three (3) years in the trade under a collective bargaining agreement between the parties to this Agreement.

"*GROUP IV*: All applicants for employment who have worked at the trade for more than one (1) year.

"If the registration list is exhausted and the Union is unable to refer applicants for employment to the Employer within forty-eight (48) hours from the time of receiving the Employer's request, Saturdays, Sundays and Holidays excepted, the Employer shall be free to secure applicants without using the referral procedure, but such applicants if hired, shall have the status of 'temporary employees'. The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such 'temporary employees', and shall replace such 'temporary employees' as soon as registered applicants for employment are available under the referral procedure."

Appellants contend there was no insistence on the part of union negotiators that the referral procedure be incorporated in the basic contract offered appellee. Also, that in any event appellee did not refuse to sign the proposed contract because of the referral procedure, but rather because appellee performed work for non-union general contractors and union organization would prevent appellee from doing business with such contractors. Although the evidence is conflicting on these issues, Mr. R. L. Webb, International Representative of the union, did testify that the referral procedure was a part of the basic contract presented to appellee. As previously pointed out, this same contract has been executed by the Arkansas Chapter of National Electrical Contractors Association and Article III, Section 7-b thereof prevents this union from granting other contractors more favorable terms than those granted to Association members. Section 7-b reads as follows:

"The union agrees that if, during the life of this Agreement, it grants to any Employer in the Electrical Contracting Industry any better terms or conditions than

those set forth in this Agreement, such better terms or conditions shall be made available to the Employers under this agreement and the Union shall notify in writing, the Employer of any such concessions * * * .''

Section 81-203 Ark. Stats. of 1947, Annotated (Section 3 of Act 101 of 1947) the enabling act for enforcement of Amendment 34 provides as follows:

''81-203. Certain Contracts prohibited.—No person, group of persons, firm, corporation, association, or labor organization shall enter into any contract to exclude from employment (1) persons who are members of, or affiliated with, a labor union; (2) persons who are not members of, or who fail or refuse to join or affiliate with, a labor union; and (3) persons who, having joined a labor union, have resigned their membership therein or have been discharged, expelled, or excluded therefrom.''

If an objective of the picketing was to force appellee to execute a contract which has the effect of excluding employees from employment or excluding applicants for such employment because of their refusal to join or affiliate with a labor union, then such picketing violates Amendment 34. On the other hand, if the picket line was established in furtherance of a lawful strike, certainly no objections could be raised because employees in the exercise of free speech had the right to advise the public of their dispute with appellee. Traditionally, one of the objectives of union organization is to obtain higher wages and better working conditions. However, it is the duty of the Court to construe the contract in the light of the evidence adduced and since the voters of Arkansas have seen fit to adopt Amendment 34 and the Legislature enacted Act 101 of 1947 allegedly to prevent discrimination because of failure to join or affiliate with a labor organization, the Court has no alternative but to apply these measures in accordance with the intention thereof.

The Chancellor interpreted the statute as applying not only to persons who are not members of a labor union but also persons who fail or refuse to affiliate with a labor union. We cannot disagree with this interpretation. The statute reads in part: "* * * or who fail or refuse to *Join,* or *affiliate with* a labor union, * * *." The word "affiliate" apparently is not used here in the same sense as the word "join". This is made even more plain by the wording in the statute immediately prior to the above language, which is: "(1) persons who are *members of,* or *affiliated with* a "labor union." In the absence of a showing that a union apprentice or the like is any less a union member than a union journeyman, it clearly appears that the General Assembly did not intend that the word affiliate should have the same meaning as join or to become a member of, otherwise the two words would not have been used in the same sentence. It is a well known principle of statutory construction that words must be construed according to their usually accepted meaning in common language, "for this is the sense in which they must be supposed to have been used by the Legislature." *Hancock* v. *State,* 97 Ark. 38. Consequently, if the referral procedure has the effect of excluding persons from employment who fail or refuse to affiliate with a labor union, then Amendment 34 and Act 101 are violated.

Applying this reasoning to Article V of the proposed agreement, we find that Paragraph 1 makes the union the sole and exclusive source of referrals and Paragraph 4 requires that a register of applicants be maintained at the union hall. This means that before a person can be employed by appellee, such person would have to go to the union hall and place his name upon the register. In doing so he is to this extent affiliating himself with the union because the union is the only source to look to for employment. This affiliation goes even further because such persons must also meet the conditions set forth in the various groupings before they can be considered for referral. One condition is that before a person can get into Group II he must have passed a

journeyman's examination given by a duly constituted local union of the International Union. Certainly he would have to further affiliate with the union in order to take this examination.

It is common knowledge that in the construction industry a contractor's work is intermittent. He moves from job to job and between jobs must lay off experienced personnel, many of whom may have worked for him for years as faithful and efficient employees. When a new job is started, this hiring hall arrangement would prevent the contractor from calling these employees directly and requesting them to come back to work. He would be required to call the union hall instead and these faithful employees would be forced to take their place on this referral list along with all the other applicants. They may or may not be referred back to the job with their old employer. In this manner the referral procedure would destroy the very thing that employees traditionally have sought and this is job security. Job security, seniority with an employer, tenure of employment, or by whatever other terminology described or defined, it must be conceded that Amendment No. 34 and Act 101 of 1947, guarantee to the individual worker the opportunity to firmly establish himself in a job without submitting to any form of control outside the normal relationship of employee and employer. This an employee could not do under the proposed contract here questioned. This right of an employee is, or at least should be, just as sacred to a union member as it is to a non-member. Under the proposed contract, union members' lawful rights (as here outlined) would suffer the same disruption and destruction as would be inflicted upon the non-members. The arrangement here in question therefore appears to be nothing more than an intricate web set up whereby the union can control employment. This control would be exclusive except for the employer's privilege of rejection. The employer would be subjected to work stoppage based upon breach of contract if he should permanently hire his brother without first referring him through the union hiring hall.

No longer could public or private employment agencies or, for that matter, competing unions refer persons directly to an employer for employment. Surely, as argued by appellants, hiring halls maintained by building and construction trade unions could and, no doubt do, serve a beneficial purpose not only for their trades but for the entire industry, and, certainly, they have a perfect right to offer this service, however, to demand by the use of the most powerful weapon at their command (i.e. strike and picket), the right, in effect, to control employment to the exclusion of all others, including the employer, is a service some employees and employers might not be inclined to cherish.

It is well settled in this jurisdiction that picketing to obtain an unlawful objective is grounds for an injunction. In *International Association of Machinists, A. F. L. Local 924* v. *Goff-McNair Motor Co.*, 223 Ark. 30, this Court said:

"On the other hand this court has held that the demand by a union that a collective bargaining agreement contain a provision in violation of Amendment 34 to the Constitution and Act 101 of 1947, coupled with picketing in an attempt to enforce such demand, is grounds for the issuance of an injunction prohibiting such picketing. *Self* v. *Taylor*, 217 Ark. 953, 235 S. W. 2d 45; *Local No. 802* v. *Asimos*, 216 Ark. 694, 227 S. W. 2d 154; *Lion Oil Co.* v. *Marsh*, 220 Ark. 678, 249 S. W. 2d 569. See also *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 69 S. Ct. 694, 93 L. Ed. 834."

In *Self* v. *Taylor*, 217 Ark. 953, this Court had occasion to deal with an agreement that was found to violate Amendment 34 due to the Union's announced intention to cancel the contract under a sixty-day notice clause if the employer hired non-union men. The Court then said:

"It was the object of the defendants, in submitting this contract, to compel the plaintiff to operate a closed shop business. He could not afford to sign such a con-

tract, under the laws of the State of Arkansas, because if he permitted union men to work for him he would have to violate the law and dismiss employees because they were not members of the union. It is an ingenious scheme, but it did not work.''

The same principle is applicable here. If appellee had signed the contract, any person thereafter seeking employment with the appellee would either have to join the union or become affiliated with it. The proposed agreement clearly would allow appellants to do by indirection exactly that which they are prohibited by law from doing directly.

It follows, therefore, that under Amendment 34 to the Constitution which was adopted by the electors of Arkansas in 1944, under the enabling statute for this amendment (Act 101 of 1947, Sec. 81-201, et seq., Ark. Stats. 1947) and the decisions of this Court construing these measures, we have no choice but to affirm the Chancellor's finding that the hiring hall arrangement sought by the union is prohibited by the Constitution and laws of this State. To hold otherwise would substitute our will, by Court decree, for the expressed will of the legislature and the people and render nugatory a portion of our Constitution without authority. Having so determined, we find it unnecessary to reach the issues pertaining to a closed shop.

Accordingly, the injunction granted by the Chancellor herein is affirmed insofar as it prohibits the appellants and those cooperating with them from picketing for the purpose of obtaining a contract containing the matters found objectionable in this opinion. See *Youngdahl* v. *Rainfair*, 355 U. S. 131, 2 L. Ed. 2d 151, 78 S. Ct. 206.

HARRIS, C.J., and GEORGE ROSE SMITH and WARD, JJ., dissent.

GEORGE ROSE SMITH, J., dissenting. In the construction industry a contractor must utilize the skills of many specialized craftsmen, such as bricklayers, concrete fin-

ishers, plumbers, electricians, painters, roofers, etc., but most of them work upon a particular job for only a few days or even a few hours. It is plain enough that a small contractor cannot maintain upon his payroll, as full-time employees, all these specialists. Hence it is desirable that some central labor pool be maintained, so that each contractor can call for the various skilled workmen as he needs them. Such an arrangement is not only advantageous to the contractors; it also affords the workmen access to whatever jobs are available in their field. Hence the hiring hall fills a definite need in the building industry. According to this record, the electrical workers' union maintains the only existing hiring hall in this craft in Pulaski county. No other agency, public or private, has undertaken to perform this necessary function in the construction business.

The union sought to include in its labor contract a provision for the recognition and continued existence of this hiring hall. The contract was fair on its face, in that it permitted the employer to reject any applicant for employment. Certainly the proposed contract met the standards suggested for such agreements in *National Labor Rel. Board* v. *Mountain Pac. Chap. of Assoc. Gen. Contractors*, 9th Cir., 270 F. 2d 425.

It is obviously possible that the hiring hall might be conducted with discrimination, so that non-union electricians would not be given equal opportunities for employment. But this record contains not a sentence, not a word, not a syllable, of testimony to show that this hiring hall is to be used as an instrument of discrimination. I am very much afraid that the effect of the majority opinion is to outlaw the hiring hall, a useful device, in all instances, even though the terms of the proposed contract appear to be wholly fair and non-discriminatory. For these reasons I would reverse the decree.