**MASTER BUILDERS OF IOWA, INC.; Associated Builders and Contractors of Iowa, Inc.; Des Moines Construction Council; Associated General Contractors of Iowa; Meisner Electric, Inc.; Shaw Electric, Inc.; Bruce Peterson; and Ronald Wayne Stratton, Appellants,**

v.

**POLK COUNTY, Iowa and Board of Supervisors of Polk County, Appellees,**

**Central Iowa Building and Construction Trades Council, Intervenor–Appellee.**

No. 02–1005.

Supreme Court of Iowa.

Nov. 14, 2002.

As Corrected Nov. 22, 2002.

---

John A. Templer, Greg A. Naylor, and Jeffrey D. Ewoldt of Pingel & Templer, P.C., West Des Moines, for appellants.

John P. Sarcone, County Attorney, and Michael O'Meara, Assistant County Attorney, for appellees.

Nolden Gentry and Bruce H. Stoltze of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, and Robert J. Henry, G. Gordon Atcheson and Charles R. Schwartz of Blake & Uhlig, P.A., Kansas City, Kansas, for intervenor-appellee.

Mark T. Hedberg of Hedberg, Owens & Hedberg, Des Moines, and Victoria L. Bor and Jonathan D. Newman of Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Washington, D.C., for amici curiae Building and Construction Trades Department, AFL-CIO, and Iowa State Building & Construction Trades Council.

Ralph Potter, Assistant County Attorney, Dubuque, Thomas F. Kintigh, City Attorney, Ottumwa, and Victoria Siegel, County Attorney, Ottumwa, for amici curiae Dubuque County, Iowa, City of Ottumwa, Iowa, and Wapello County, Iowa.

CADY, Justice.

In this appeal, we must decide whether a county may legally utilize a project labor agreement to effectuate the completion of a large-scale public works project. We conclude that the use of such an agreement is permissible under current Iowa and federal law and affirm the district court.

## I. Background Facts and Proceedings.

The Iowa Events Center (Events Center) is the planned centerpiece of a series of public works projects meant to advance the profile and prestige of Polk County both inside and outside the state. The Events Center is actually three projects in one: a newly constructed 16,000–seat arena, a newly constructed 100,000 square foot exhibition hall, and a renovation of Veterans Memorial Auditorium. The project was initially budgeted at a cost of $212 million and was slated to open in late 2004.

The cost and scale of the Events Center project caused Polk County, through the actions of the Polk County Board of Supervisors (collectively Board), to pursue a mixture of methods to fund and then construct the project. Polk County applied for and was awarded fifty million dollars from the Vision Iowa fund. The Board also issued general obligation municipal bonds, an undertaking that prompted this court's first consideration of issues surrounding the Events Center project. *See Bowers v. Polk County Bd. of Supervisors,* 638 N.W.2d 682 (Iowa 2002). At the same time the Board pursued funding, it also began to consider the methods by which the project could be completed in a timely and fiscally responsible manner. One possible method brought to the Board's attention was the implementation of a project labor agreement (PLA).

The PLA option was first presented to the Board by representatives of the Central Iowa Building and Construction Trades Council (CIBCTC), who began contacting Board members individually before October 2001. On October 18, 2001, the Board received a letter from CIBCTC representatives further advocating the use of a PLA. That letter was followed by a letter from representatives of Master Builders of Iowa, Associated Builders and Contrac-

tors, Des Moines Construction Council, and Associated General Contractors of Iowa (collectively Master Builders) stating a number of objections to the adoption of such an agreement. By late fall 2001, lobbying of varying degrees by both sides of the issue clearly had become an undercurrent to the Board's consideration of a PLA for the Events Center project.

Eventually, the Board requested that the construction manager hired to supervise the project, Weitz–Turner, undertake its own evaluation of the propriety of a PLA. On November 20, 2001, Weitz–Turner issued a report, in the form of a letter to the Board, in response to the Board's request. The report listed various advantages of a PLA, but also listed disadvantages and a number of other factors that Weitz–Turner advised the Board to consider before making a final decision on adoption of such an agreement. One week later, the Board approved a resolution directing the negotiation of an Events Center PLA. Negotiations soon were undertaken between representatives of Polk County and CIBCTC. On January 8, 2002, the Board considered and adopted, by a vote of 4–1, a resolution calling for the incorporation of the fully negotiated and finalized PLA into all future Events Center construction contracts.

On January 22, 2002, Master Builders filed a petition for declaratory judgment and temporary and permanent injunctive relief in the Iowa District Court for Polk County, naming Polk County and the Board as defendants and challenging the legality of the Events Center PLA on a number of grounds. This petition was subsequently amended to add additional plaintiffs. CIBCTC also moved for intervention and was allowed to intervene as a defendant.

Central among the plaintiffs' challenges was the claim that the Events Center PLA violated the state's right-to-work and competitive bidding laws. They also asserted a number of claims under federal law, including arguments that the PLA was preempted by the National Labor Relations Act (NLRA) and the Employee Retirement Income Security Act (ERISA) and violated constitutional rights of due process, equal protection, and free association. A hearing on the matter was held, commencing on June 2, 2002. After completion of the hearing, each party submitted its own proposed findings of fact and conclusions of law. On June 28, 2002, the court issued its findings of fact, conclusions of law and order, finding in favor of the Board on each of the five argument areas advanced by Master Builders.

Master Builders made timely notice of appeal to this court. We expedited our consideration of this appeal given the importance of the issues presented and the great public cost attendant to further delay of the disposition of this matter.

## II. Standard of Review.

 The parties dispute the standard of review with which we should consider the findings of the district court. The petition in this action was styled as one for declaratory judgment and injunctive relief. We review actions for injunctive relief de novo. *Owens v. Brownlie*, 610 N.W.2d 860, 865 (Iowa 2000). Our review of actions for declaratory judgment depends on how the action was tried to the district court. *Id.* To determine the proper standard of review, we must consider the "pleadings, relief sought, and nature of the case [to] determine whether a declaratory judgment action is legal or equitable." *Nelson v. Agro Globe Eng'g, Inc.*, 578 N.W.2d 659, 661 (Iowa 1998). In addition, we consider "whether the court ruled on evidentiary objections" as an important,

although not dispositive, test of whether the case was tried in law or equity. *Id.*

Balancing these factors leads to the conclusion that this case was fully tried in equity. Master Builders has pursued relief from the adoption and incorporation of the PLA into Events Center construction contracts and has not pursued monetary relief of any sort. Both the pleadings and the relief sought were focused on declaratory and injunctive relief, both equitable remedies. Moreover, although the district court ruled on some evidentiary objections in the course of trial, the objections were minor and did not have significant effect on the proceedings. Although we prefer that a trial judge refrain from such rulings, we do not believe the rulings in this trial altered the true nature of the district court proceedings. *Sille v. Shaffer,* 297 N.W.2d 379, 380–81 (Iowa 1980). Because this matter was tried by the district court wholly in equity, we review this appeal de novo. Iowa R.App. P. 6.4; *Owens,* 610 N.W.2d at 865.

### III. Background of Project Labor Agreements.

■ A PLA is a " 'prehire' collective bargaining agreement" used by a project owner to set the terms under which a contractor who successfully bids on the project proceeds in all labor relations connected to its subsequent work on the project.[1] U.S. Gen. Accounting Office, Pub. No. GAO/GGD–98–82, Project Labor Agreements: The Extent of Their Use and

Related Information at 1 (1998) [hereinafter U.S.G.A.O.]; *N.Y. State Chapter, Inc. v. N.Y. State Thruway Auth.,* 88 N.Y.2d 56, 643 N.Y.S.2d 480, 483, 666 N.E.2d 185 (1996); *see also Bldg. & Constr. Trades Dept., AFL–CIO v. Allbaugh,* 295 F.3d 28, 30 (D.C.Cir.2002). A PLA is considered a prehire agreement because it "can be negotiated before employees vote on union representation or before the contractor hires any workers" and typically "provides that only contractors and subcontractors who sign [the] prenegotiated agreement with the union can perform project work." U.S.G.A.O., at 1; *N.Y. State Chapter, Inc.,* 643 N.Y.S.2d at 483, 666 N.E.2d 185. In most industries, the NLRA outlaws such agreements. National Labor Relations Act, 29 U.S.C. § 158(a), (b) (2000). PLAs, however, operate under the "construction industry" exception to the NLRA, which allows prehire agreements because of "the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a longstanding custom of prehire bargaining in the industry." *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 231, 113 S.Ct. 1190, 1198, 122 L.Ed.2d 565, 578 (1993); 29 U.S.C. § 158(f).

When utilized, a PLA is incorporated into every contract entered into for a project. Moreover, PLAs are comprehensive in their coverage of contractor/labor issues:

---

1. PLAs have been used on public projects dating back to at least 1938. U.S. Gen. Accounting Office, Pub. No. GAO/GGD–98–82, Project Labor Agreements: The Extent of Their Use and Related Information at 4 (1998) [hereinafter U.S.G.A.O.]. In 1993, the United States Supreme Court determined that a PLA is not preempted under the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–187 (2000), unless the governmental entity owning the project acts in a regulatory capacity in its utilization of the PLA. *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 227, 113 S.Ct. 1190, 1196, 122 L.Ed.2d 565, 576 (1993). Anecdotal evidence indicates that PLAs have been used more frequently in the aftermath of the Court's decision. U.S.G.A.O., at 3.

Their provisions generally (1) apply to all work performed under a specific contract or project, or at a specific location; (2) require recognition of the signatory unions as the sole bargaining representatives for covered workers, whether or not the workers are union members; (3) supersede all other collective bargaining agreements; (4) prohibit strikes and lockouts; (5) require hiring through union referral systems; (6) require all subcontractors to become signatory to the agreement; (7) establish uniform work rules covering overtime, working hours, dispute resolution, and other matters; and (8) prescribe craft wages, either in the body of the agreement or in an appendix or attachment.

U.S.G.A.O., at 4. For this reason, they are often presented as "the ideal bargain between the interests of the contractors and employees and the developer and the owner of the project." Jolie M. Siegel, Comment, *Project Labor Agreements and Competitive Bidding Statutes,* 3 U. Pa. J. Lab. & Emp. L. 295, 297–98 (2001).

With this background in mind, we turn to the challenges presented to the PLA in this case. Many of the issues presented by this appeal have not previously been presented to this court but have a long and conflict-laden past.

### IV. The Right–to–Work Statute.

▉▉▉▉ The passage by Congress of the Labor Management Relations (Taft–Hartley) Act (Act) in 1947 altered the nature of labor relations in the United States and produced more than a half-century of social, political, and jurisprudential repercussions that form the battleground on which this appeal has developed. The Act constituted an all-encompassing revision of labor relations law meant to reform the labor practices that had arisen under previous labor relations acts. *See* 29 U.S.C. §§ 141, 151. In passing the Act, Congress reasserted its prominence in the field of labor relations, save for a few areas in which the states retained leeway to define the contours of labor relations within their borders. *See id.* One of these exceptions, found in § 14(b) of the Act and codified at 29 U.S.C. § 164(b), is integral to the first area of dispute between the parties in this appeal. *Id.* § 164(b). Section 164(b) provides,

> Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

*Id.*

Prior to passage of the Act, some states, including Iowa,[2] had passed constitutional amendments or statutes barring discrimination in employment based on union affiliation. In adopting § 164(b), Congress refrained from preempting these state laws that protected the "right to work." *See* H.R.Rep. No. 80–510 (1947), *reprinted in* 1947 U.S.C.C.A.N. 1135, 1166. Soon thereafter, in companion cases, the United States Supreme Court upheld three states' right-to-work laws against challenges by unions and union members that such laws "denie[d] them freedom of speech, assembly or petition, impair[ed] the obligation of their contracts, or depriv[ed] them of due

---

**2.** Iowa's right-to-work law was approved April 28, 1947, and became effective May 1, 1947. 1947 Iowa Acts ch. 296, at 390. The Taft–Hartley Act was passed over a presidential veto on June 23, 1947 and became effective on August 22, 1947. Labor Management Relations (Taft–Hartley) Act, ch. 120, 61 Stat. 136, 162, 152 (1947), *reprinted in* 1947 U.S.C.C.A.N. 135, 168, 155.

process of law." *Am. Fed'n of Labor v. Am. Sash & Door Co.*, 335 U.S. 538, 540, 69 S.Ct. 258, 259, 93 L.Ed. 222, 224 (1949); *see also Lincoln Fed. Labor Union v. N.W. Iron & Metal Co.*, 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212 (1949). Perhaps bolstered by the sanction of Congress and the Court, other states joined those that had already passed a right-to-work law, eventually bringing the total number of states with such a law to twenty-two.[3]

The words of the principle Iowa statutory provision, unaltered since its initial adoption, mirror those of other states in stating:

> It is declared to be the policy of the state of Iowa that no person within its boundaries shall be deprived of the right to work at the person's chosen occupation for any employer because of membership in, affiliation with, withdrawal or expulsion from, or refusal to join, any labor union, organization, or association, and any contract which contravenes this policy is illegal and void.

Iowa Code § 731.1 (2001). Additional provisions apply this same policy in particular fields or provide limited exceptions. *See id.* §§ 731.1–.9.

The appellants argue that the Events Center PLA violates the letter and spirit of chapter 731. For this reason, they assert that any current contracts in which

the PLA has been incorporated are void and future contracts cannot include its terms. The appellants particularly attack a provision of the PLA that dictates the method by which "core" employees of contractors working on the Events Center project would be referred to the job site for employment:

### ARTICLE IV

### UNION RECOGNITION AND EMPLOYMENT

. . .

Section 5. To ensure that all enterprises will have an opportunity to employ their "core" employees on this Project, the parties agree that in those situations where a Contractor not a party to the current collective bargaining agreement with the signatory Union having jurisdiction over the affected work is a successful bidder, the Contractor may request by name, and the Local will honor, referral of persons who have applied to the local union for Project work and who meet at least one of the following qualifications:

(a) possess any license required by the city, county, state or federal law for the Project work to be performed;

(b) have worked a total of at least 1,000 hours in the appropriate con-

---

3. Ariz. Const. art. XXV; Ark. Const. amend. 34; Fla. Const. art. I, § 6; Kan. Const. art. 15, § 12; Miss. Const. art. 7, § 198–A; Neb. Const. art. XV, §§ 13–15; Okla. Const. art. XXIII, § 1A; S.D. Const. art. VI, § 2; Ala. Code §§ 25–7–6, –30 to –36 (2000); Ariz.Rev. Stat. Ann. §§ 23–1301 to –1307 (West 1995); Ark.Code Ann. §§ 11–3–301 to –304 (Michie 2002); Fla. Stat. Ann. §§ 447.01, 447.17 (West 2002); Ga.Code Ann. §§ 34–6–20 to –28 (Harrison 1998); Idaho Code §§ 44–2001 to –2012 (Michie 1997); Iowa Code §§ 731.1–.9 (2001); Kan. Stat. Ann. § 44–831 (2000); La.Rev.Stat. Ann. §§ 23:881–:889, 23:981–:987 (West 1998 & Supp.2002); Miss.

Code Ann. § 71–1–47 (1999); Neb.Rev.Stat. Ann. §§ 48–217 to –219, 48–911 (Michie 2002); Nev.Rev.Stat. 613.230–.300 (2001); N.C. Gen.Stat. §§ 95–78 to –84 (2001); N.D. Cent.Code § 34–01–14 (1987); S.C.Code Ann. §§ 41–7–10 to –90 (Law.Co-op.1986); S.D. Codified Laws §§ 60–8–3 to –8, 60–10–10 (Michie 1993); Tenn.Code Ann. § 50–1–201 to –204 (1999); Tex. Lab.Code Ann. §§ 101.051–.053, 101.301–.303 (Vernon 1996); Utah Code Ann. §§ 34–34–1 to –17 (2001); Va.Code Ann. §§ 40.1–58 to –69 (Michie 2002); Wyo. Stat. Ann. §§ 27–7–108 to –115 (Michie 2001); *see generally* 48 Am.Jur.2d *Labor & Labor Relations* § 660 (1994).

struction craft during the prior 3 years; or

(c) were on the Contractor's active payroll for at least sixty (60) out of the 180 calendar days prior to the contract award.

The Union will refer to such Contractor one journeyperson employee from the hiring hall out-of-work list for the affected trade or craft, and will then refer one of such Contractor's "core" employees as a journeyperson and shall repeat the process, one and one in accordance with the following table:

| Total Crew Size | % of Core Employees |
| --- | --- |
| 1–14 | 50% |
| 20 | 40% |
| 25 | 36% |
| 33 | 30% |
| 50 | 22% |
| 60 | 20% |
| 77 | 17% |
| 100 | 14% |

Thereafter, all additional employees in the affected trade or craft shall be hired exclusively from the hiring hall out-of-work list(s), which are open to any individual, regardless of Union membership.

The appellants assert that this section of the PLA effectively creates a "union hiring hall," the operation of which violates chapter 731. *Id.* Union hiring halls have been objected to by non-union employers and employees in a variety of contexts and have been found to violate some states' right-to-work laws. *See Kaiser v. Price–Fewell, Inc.*, 235 Ark. 295, 359 S.W.2d 449, 453–54 (1962); *Bldg. Trades Council v. Bonito*, 71 Nev. 84, 280 P.2d 295, 297 (1955); *Branham v. Miller Elec. Co.*, 237 S.C. 540, 118 S.E.2d 167, 170 (1961); *Sheet Metal Workers Local No. 175 v. Walker*, 236 S.W.2d 683, 685 (Tex.Civ.App.1951). Although there may be merit to appellants' characterization of the mechanism created by this section of the PLA, we disagree with the appellants' contention that such an arrangement violates Iowa's right-to-work law. Indeed, we can find no violation of the right-to-work law arising from the inclusion of the PLA in Events Center contracts for three reasons.

First of all, we do not agree that the right-to-work law has the scope that the appellants assert it does. All right-to-work laws, including Iowa's, operate within a limited sphere carved from the pervasive federal regulations created in part by the Taft–Hartley Act. In carving the exception for state right-to-work laws in the Act, Congress noted the specific type of laws it intended to save from preemption:

Many States have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in those States illegal. It was never the intention of the National Labor Relations Act, as is disclosed by the legislative history of the act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the so-called "closed shop" proviso in section 8(3) of the existing act nor the union shop and maintenance of membership proviso in section 8(a)(3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there should be no question about this, section 13 was included in the House bill. The conference agreement, in section 14(b), contains a provision having the same effect.

H.R.Rep. No. 80–510 (1947), *reprinted in* 1947 U.S.C.C.A.N. 1135, 1166.

Although we have no clear proof of the actual intent of the legislature in passing Iowa's right-to-work law, we find Congress' reference to state right-to-work laws at the time instructive. Accordingly, we find that Iowa's right-to-work law is in place only to prevent "compulsory union-

ism," or "conditions that would come into effect only after an individual is hired" and require the employee to join a union or pay the equivalent of dues to a union to maintain employment. *See Oil, Chem. & Atomic Workers Int'l Union, AFL–CIO v. Mobil Oil Corp.*, 426 U.S. 407, 416–17, 96 S.Ct. 2140, 2145, 48 L.Ed.2d 736, 744 (1976); *see also Walles v. Int'l Bhd. of Elec. Workers, AF of L–CIO*, 252 N.W.2d 701, 706–07 (Iowa 1977); *Ludwig v. Armour & Co.*, 158 N.W.2d 646, 650 (Iowa 1968). No such condition exists under the terms of the Events Center PLA. Moreover, to give the statute a broader reading that encompasses the provisions of the PLA would take it outside of the scope of permissible state lawmaking condoned by Congress in 29 U.S.C. § 164(b) and into an area that is almost surely preempted by federal law. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245–46, 79 S.Ct. 773, 780, 3 L.Ed.2d 775, 783–84 (1959); *see also Walles*, 252 N.W.2d at 707; *Ludwig*, 158 N.W.2d at 651. We find that the right-to-work law does not have the sweep asserted by the appellants, is not preempted by federal law, and does not require the invalidation of the Events Center PLA.

■ There are also two further reasons why we conclude the PLA does not violate the right-to-work law. The use of union hiring halls in a bargaining agreement such as a PLA is not *per se* invalid. *See Local 357, Int'l Bhd. of Teamsters v. Nat'l Labor Relations Bd.*, 365 U.S. 667, 673, 81

S.Ct. 835, 838, 6 L.Ed.2d 11, 16–17 (1961). Only if such a device is used to discriminate between union and non-union members will it run afoul of the law. *See id.* at 674–75, 81 S.Ct. at 839, 6 L.Ed.2d at 17–18; *Laborers' Int'l Union of N.Am., Local No. 107 v. Kunco, Inc.*, 472 F.2d 456, 459 (8th Cir.1973); *Local 514, Transp. Workers Union v. Keating*, 212 F.Supp.2d 1319, 1326 (E.D.Okla.2002); *State ex rel. Assoc. Builders & Contractors v. Jefferson County Bd. of Comm'rs*, 106 Ohio App.3d 176, 665 N.E.2d 723, 726 (1995). There is simply not enough evidentiary support in the record to conclude that such discrimination has or will occur in relation to the Events Center PLA. *See Local 357, Int'l Bhd. of Teamsters*, 365 U.S. at 675, 81 S.Ct. at 839, 6 L.Ed.2d at 17–18; *Ketcher v. Sheet Metal Workers' Int'l Ass'n*, 115 F.Supp. 802, 817 (E.D.Ark.1953); *Holley v. Painters Local Union No. 318*, 376 S.W.2d 44, 47–48 (Tex.Ct.App.1964).

At first blush, it appears that the hiring hall provision provides a discriminatory advantage to union workers over non-union workers based on the formulas provided for referring workers to the job site. First, the referral formula calls for "one journeyperson employee from the hiring hall out-of-work list for the affected trade or craft" to be assigned before referral of "one of such Contractor's 'core' employees." Second, the formula calls for a decreasing apportionment of core employees based on the total crew size needed. Both of these provisions have the *potential*[4] to

---

4. Although we find insufficient evidence of discrimination to invalidate the Events Center PLA, we recognize the quandary faced by a non-union worker in the aftermath of our decision. As one commentator has noted:

> ... One need not be a cynic to observe that a union which bears the burden of maintaining a hiring hall or referral system will be tempted to favor its adherents or prospective adherents when employment

opportunities arise. The employer who makes an exclusive delegation of clearance or referral for employment to a union would indeed by naive if he did not anticipate this result.

Most important of all, the applicant for employment—the fellow who is looking for a job—is directly and seriously affected. He isn't troubled with statutory schemes or legal analysis. He knows only that if his

discriminate, but they do not discriminate solely by their incorporation into the PLA.

The PLA states explicitly that the hiring hall lists "are open to any individual, regardless of Union membership." For this reason, it is feasible that the first part of the formula could result in the selection of either a union or non-union worker off of the hiring hall list. There is no evidence in the record that selection from the hiring hall list guarantees selection of a union employee over a non-union employee, or vice versa. It is also far from clear whether the apportionment of union and non-union workers under the second portion of the formula would be discriminatory. Although it would appear likely that "a Contractor not a party to the current collective bargaining agreement with the signatory Union having jurisdiction over the affected work" will turn out to be a non-union contractor, the record includes evidence that there are union contractors not party to the indicated agreements whose employees would have to be assigned through the core employee referral system to work on site. Thus, union and non-union employees may be subject to the referral process and the apportionment of workers may proceed without discrimination due to union status. Ultimately, there is no evidence that the provisions of the PLA, on its face, are discriminatory.

Moreover, and finally, the PLA specifically provides,

> The Contractor and Union agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, age, marital status, *union membership* or physical or mental disability in any manner prohibited by law or regulation. . . .

This form of non-discrimination clause has been found to be a sufficient protection against potential discrimination that may arise from the use of a union hiring hall by a number of courts, including the United States Supreme Court. *See Local 357, Int'l Bhd. of Teamsters,* 365 U.S. at 675, 81 S.Ct. at 839, 6 L.Ed.2d at 18. We find no reason to depart from this established line of authority. *See id.; Laborer's Int'l Union of N.Am., Local No. 107,* 472 F.2d at 458–59; *Nat'l Labor Relations Bd. v. Tom Joyce Floors, Inc.,* 353 F.2d 768, 771 (9th Cir.1965); *Ketcher,* 115 F.Supp. at 817.

Ultimately, we find that the Events Center PLA does not violate Iowa's right-to-work law. We underscore, however, that any employee, non-union or union, retains the right to pursue redress of any employment discrimination with the National Labor Relations Board. *See, e.g.,* 29 U.S.C. § 158(a)(3) (unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization").

## V. The Competitive Bidding Statute.

■ Under Iowa law, "[w]hen the estimated cost of a public improvement ... exceeds [$50,000] the [county board of supervisors] shall follow the contract letting

---

particular skill lies in an area encompassed by a union hiring hall or exclusive referral system, he gets his job through the union or he may not eat. For the average mortal, an empty stomach is a persuasive advocate. If union membership or adherence to union policy is the only road to employment, then other considerations dwindle in importance. The free choice which the [Taft-Hartley] act is designed to guarantee—the right to join or not to join a union, to be a good, bad or indifferent member, to support or to oppose union policies—becomes a luxury that the worker cannot afford.

Jerome D. Fenton, *Union Hiring Halls Under the Taft–Hartley Act,* 9 Lab. L.J. 505, 506–07 (1958).

procedures provided for cities in sections 384.95 to 384.103." Iowa Code § 331.341. Sections 384.95 to 384.103 include a number of factors and steps to be considered in the contract letting process. *Id.* §§ 384.95–.103. The focus here is on section 384.99, which provides in part, "[t]he contract for the public improvement must be awarded to the *lowest responsible bidder.*" *Id.* § 384.99 (emphasis added). Both parties agree that the inclusion of the word *responsible* in the standard for awarding contracts implies a measure of discretion on the part of a political subdivision in its consideration of what bid to ultimately accept for a project. Where the parties differ is in their interpretation of the point at which such discretion may be exercised.

Master Builders argues that the Board's power arises only after bidding has concluded and then exists to give the Board the discretion to balance considerations of cost as well as the ability of a bidding party to complete the work in a "responsible" manner before choosing the successful bidder. The Board argues that the language of the statute implies discretion throughout the bidding process, including discretion to define what constitutes a responsible bidder. Under this theory, the Board asserts, the adoption of the PLA is an appropriate exercise of discretion given its effect of defining a responsible bidder as one who will work under the conditions set forth in the PLA.

■ Although we have not had the opportunity to fully consider the appropriate timing for the exercise of the discretion accorded a county in operating under the lowest responsible bidder standard, we have had a number of opportunities to consider the standard generally.[5] *See City of Des Moines v. Master Builders of Iowa*, 498 N.W.2d 702, 704 (Iowa 1993); *Istari Constr., Inc. v. City of Muscatine*, 330 N.W.2d 798, 800–01 (Iowa 1983); *Dunphy v. City Council*, 256 N.W.2d 913, 921 (Iowa 1977); *Everds Bros. v. Gillespie*, 256 Iowa 317, 320–22, 126 N.W.2d 274, 276–77 (1964); *Horrabin Paving Co. v. City of Creston*, 221 Iowa 1237, 1243, 262 N.W. 480, 484 (1935); *Wigodsky v. Town of Holstein*, 195 Iowa 910, 916–17, 192 N.W. 916, 919 (1923); *Urbany v. City of Carroll*, 176 Iowa 217, 221–22, 157 N.W. 852, 854 (1916); *Miller v. City of Des Moines*, 143 Iowa 409, 418–23, 122 N.W. 226, 230–31 (1909). The paramount purpose of the competitive bidding statute is to protect the public as taxpayers, and that purpose must not be impaired in interpreting the statute. *See Garling Constr., Inc. v. City of Shellsburg*, 641 N.W.2d 522, 523 (Iowa 2002); *Elview Constr. Co. v. North Scott Cmty. Sch. Dist.*, 373 N.W.2d 138, 141 (Iowa 1985); *Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 655 (Iowa 1984); *Wigodsky*, 195 Iowa at 917, 192 N.W. at 919; *Miller*, 143 Iowa at 420, 122 N.W. at 230. We believe the approach

---

**5.** We recognize, of course, that, historically, the legislature has provided different standards to apply in awarding municipal contracts depending on the status of the political subdivision letting a contract and the nature of the public improvement to be completed. *See* Iowa Code §§ 391.31 ("lowest bidder"), 391A.17 ("lowest bidder"), 397.18 ("best interest of the municipality"), 417.51 ("lowest responsible bidder") (1971). However, in 1972, the legislature adopted the Iowa Home Rule Amendment, and in so doing, selected the "lowest responsible bidder" standard as the standard under which all contracts for public improvements were to be considered. 1972 Iowa Acts ch. 1088, § 180 (retaining a provision allowing for explicit consideration of the "best interests of the city" for "contracts relating to public utilities"). Although the test for determining a successful bidder has changed over time, the paramount purpose of the competitive bidding statute has not.

advanced by Master Builders would impair the statute's purpose.

We have determined previously that the competitive bidding statute operates to "provide a [county] with the *best* results at the lowest possible price." [6] *City of Des Moines*, 498 N.W.2d at 704 (emphasis added). Finding the lowest possible price between bids is a simplistic and mechanical process limited to unsealing and comparing submitted bids. Determining the bid that will provide the best results requires greater discretion. It would be a waste of public resources—and thus a harm to the public as taxpayers—to require an entity such as the Board to simply react to whatever bids are produced in deciding what contractor is the most responsible and is most likely to produce the best results. *See Assoc. Builders & Contractors, Inc. v. San Francisco Airports Comm'n*, 21 Cal.4th 352, 87 Cal. Rptr.2d 654, 981 P.2d 499, 507 (1999); *Queen City Constr., Inc. v. City of Rochester*, 604 N.W.2d 368, 374 (Minn.Ct.App. 1999); *A. Pickett Constr., Inc. v. Luzerne County Convention Ctr. Auth.*, 738 A.2d 20, 24 (Pa.Cmwlth.Ct.1999). The Events Center PLA pre-defines the universe of responsible bidders as those that can and will operate under its terms thus allowing the Board to peremptorily designate the contractors it has determined will produce the best results. This does not mean that the Board is later constrained in choosing what contractor is the lowest responsible bidder. It simply means that the discretion to determine what constitutes the best

results for a public contract exists throughout the contract letting process.

Although we make our own interpretation of Iowa's competitive bidding statute, our approach is consistent with the approaches taken by other state courts that have considered and upheld a PLA under their state's competitive bidding statute. *See San Francisco Airports Comm'n*, 87 Cal.Rptr.2d 654, 981 P.2d at 506–07; *John T. Callahan & Sons, Inc. v. City of Malden*, 430 Mass. 124, 713 N.E.2d 955, 961–62 (1999); *Queen City Constr., Inc.*, 604 N.W.2d at 378; *Assoc. Builders & Contractors, Ins. v. S. Nev. Water Auth.*, 115 Nev. 151, 979 P.2d 224, 228–29 (1999); *N.Y. State Chapter, Inc.*, 643 N.Y.S.2d at 485–87, 666 N.E.2d 185 (upholding one of two challenged PLAs under the state law); *State ex rel. Assoc. Builders & Contractors*, 665 N.E.2d at 727; *A. Pickett Constr., Inc.*, 738 A.2d at 24; *Assoc. Builders & Contractors of Rhode Island, Inc. v. Department of Admin.*, 787 A.2d 1179, 1189–90 (R.I.2002). Only two courts have invalidated PLAs for violating the state's competitive bidding law. *See Tormee Constr., Inc. v. Mercer County Improvement Auth.*, 143 N.J. 143, 669 A.2d 1369, 1372 (1995); *George Harms Constr. Co. v. N.J. Tpk. Auth.*, 137 N.J. 8, 644 A.2d 76, 95 (1994); *N.Y. State Chapter, Inc.*, 643 N.Y.S.2d at 488–89, 666 N.E.2d 185 (striking one of two challenged PLAs under the state law). Both of these jurisdictions applied competitive bid standards that placed greater emphasis on competition or the

---

**6.** We have also stated previously that another purpose of the competitive bidding statute is to " 'forestall fraud, favoritism and corruption in the making of contracts.' " *Istari Constr., Inc. v. City of Muscatine*, 330 N.W.2d 798, 800 (Iowa 1983) (citation omitted). A long-standing objection to PLAs is that such agreements are an expression of favoritism toward union labor. Although the competitive bidding statute addresses favoritism, it does so

only in the context of ensuring a competitive bidding process. The Events Center PLA applies to all bidders and does not discriminate between those of union or non-union affiliation. Therefore, the PLA does not, on its face, promote fraud, favoritism, or corruption in the actual bidding process, and any assertion to the contrary is more anecdotal than factual. We must rely on the agreement to be performed as it is written.

actions of the political subdivision in the bidding process as compared to Iowa's statute. *Tormee Constr., Inc.*, 669 A.2d at 1371; *George Harms Constr. Co.*, 644 A.2d at 90–91; *N.Y. State Thruway Auth.*, 643 N.Y.S.2d at 485, 666 N.E.2d 185; *see also San Francisco Airports Comm'n*, 87 Cal. Rptr.2d 654, 981 P.2d at 509. Iowa law places greater emphasis on protecting the public as taxpayers. *See Garling Constr., Inc.*, 641 N.W.2d at 523; *Wigodsky*, 195 Iowa at 917, 192 N.W. at 919. Although this protection could include emphasizing competition in an effort to produce the absolute lowest cost for a project, the choice in prioritization is in the discretion of the political subdivision letting the contract. In this situation, the choices made by the Board do not violate the competitive bidding law.

## VI. Preemption Under the National Labor Relations Act.

As discussed previously, federal labor regulations, codified as the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–187, form a pervasive network of regulations intended to cover most, although not all, facets of labor relations in the United States. *See Weber v. Anheuser–Busch, Inc.*, 348 U.S. 468, 480, 75 S.Ct. 480, 488, 99 L.Ed. 546, 557 (1955). Not surprisingly, the scope of the NLRA often results in preemption of state labor regulation, subject to the limited exceptions found in the act. The United States Supreme Court has articulated two approaches for determining whether preemption of a state labor law should occur. *See Colfax Corp. v. Ill. State Toll Highway Auth.*, 79 F.3d 631, 633 (7th Cir.1996) (describing the two types of NLRA preemption, commonly referred to as *"Garmon"* and *"Machinists"* preemption). The Court also has stated,

> When a State owns and manages property … it must interact with private participants in the marketplace. In so doing, the State is not subject to preemption by the NLRA because pre-emption doctrines apply only to state *regulation.*

*Bldg. & Constr. Trades Council*, 507 U.S. at 227, 113 S.Ct. at 1196, 122 L.Ed.2d at 576 (emphasis in original). Therefore, if we determine that the Board has operated in a proprietary mode, as opposed to a regulatory mode, in adopting the PLA, preemption does not apply. *See id.*

Master Builders asserts that the Board's adoption of the PLA was a regulatory action. The appellants point in particular to a provision of the PLA providing, "the owner may, at any time, and at its sole discretion, determine to build or modify additional projects under this agreement not currently proposed." This provision, they argue, is written in such a manner as to allow the Board to apply the terms of the Event Center PLA to subsequent labor contracts, thus making the PLA a regulatory scheme preempted under the NLRA. Master Builders also cites statements in the record by individual Board members that it believes indicate a regulatory purpose behind the passage of the PLA. The Board responds to these assertions by taking issue with Master Builders' characterization of the PLA clause and the statements of Board members, and by arguing that the Board's use of the PLA constitutes proprietary action.

We conclude that the actions of the Board in adopting the PLA are proprietary and are not preempted by the NLRA. Master Builders strains to find regulatory motives in the words of the PLA and the actions of the Board that we simply believe do not exist. Although we agree that the language cited by the appellants as allowing for the extension of the PLA to other projects is ambiguous, the enabling resolu-

tion for the PLA limits its use to the Events Center project alone. Failure to so limit the PLA would be a serious breach of the public trust and likely also would be a violation of the law. *See* Iowa Code §§ 21.1–.11. We will not assume that the Board has integrated a clause in the PLA that would allow such a blatant action.

Moreover, we do not consider the comments of the individual Board members to be sufficient evidence of regulatory intent. We join other courts in refusing to hunt for a regulatory motive if the ultimate action of the governmental entity is proprietary such as is the case here in the "contracting for services on a specific project." *See Colfax Corp.*, 79 F.3d at 634–35; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1335–36 (D.C.Cir.1996); *Legal Aid Soc'y v. City of New York*, 114 F.Supp.2d 204, 237 (S.D.N.Y.2000). Sanctioning the continual second-guessing of the actions of a political subdivision in situations such as this would undermine the very principles of discretion already discussed.

## VII. Preemption Under the Employee Retirement Income Security Act.

■ The appellants assert a second preemption argument, arguing that the Events Center PLA operates as an intrusion into employee benefit plan regulation in contravention of the provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. Pursuant to 29 U.S.C. § 1144(a), ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." A state law under ERISA "includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). We determined in our discussion of preemption under the NLRA

standards that the actions of the Board in adopting the PLA were proprietary in nature. For that reason, the adoption of the PLA does not constitute state law and is not preempted under ERISA. *See Assoc. Gen. Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1183 (9th Cir.1998); *Minn. Chapter of Assoc. Builders & Contractors, Inc. v. County of St. Louis*, 825 F.Supp. 238, 243 (D.Minn.1993).

## VIII. Constitutional Claims.

Master Builders asserts violations of three constitutional rights: Due Process, Equal Protection, and Free Association. U.S. Const. amends. V; XIV, § 1; I. We consider each of these claims in turn.

### 1. Due Process.

■ The Iowa Constitution provides, "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. This provision of the Iowa Constitution mirrors the provisions of the United States Constitution. U.S. Const. amends. V, XIV, § 1. Accordingly, we interpret both the Iowa and federal Due Process Clauses in the same fashion, including approaching due process questions under a rubric differentiating between "procedural" and "substantive" due process. *Bowers*, 638 N.W.2d at 690.

■ Master Builders asserts that the adoption of the PLA has resulted in the denial of procedural due process because the appellants, as taxpayers, were deprived of a property right in getting the lowest possible price for the Events Center without sufficient notice or opportunity to be heard. The determination of whether an infringement of procedural due process rights has occurred is a two-step inquiry requiring us to first determine whether a protected liberty or property interest is involved and then consider what

process is due before a deprivation of that interest. *Id.* at 691.

Assuming, although not deciding, that a taxpayer has a property interest in receiving the lowest possible price on a public contract, we struggle to find how the appellants were truly denied notice and opportunity to be heard in adoption of the PLA. The record reflects that the appellants began to protest the adoption of the PLA with the Board in fall 2001 prior to the adoption of the resolution incorporating the PLA, the Board authorized the negotiation of the PLA at an open meeting attended by representatives of the appellants who were given an opportunity to object to the PLA during the course of the meeting, the appellants had the opportunity to object at the public meeting during which the resolution adopting the PLA was approved, the appellants have had an opportunity to seek redress from the adoption of the PLA in the court system, and there is no evidence in the record to clearly support the assertion that the Board had predetermined that the PLA would be adopted before actually passing the enabling resolution, as the appellants have alleged. Given the extensive opportunities offered to the appellants to be heard before and after the adoption of the PLA, we conclude they suffered no deprivation of their due process rights.

## 2. Equal Protection.

The United States Constitution prohibits states from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Similarly, the Iowa Constitution prohibits laws that "grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. Much like the Due Process Clauses, these two clauses are deemed to be the same "in scope, import, and purpose" and are interpreted in the same manner. *Bowers,* 638 N.W.2d at 689. The purpose of equal protection is to ensure that similarly situated persons are treated the same. *Id.* The key to analyzing equal protection questions is the determination of the level of scrutiny and review to which the action in question must be subjected. "Unless a suspect class or a fundamental right is involved," a classification made by a state actor "need only have a rational basis." *Id.*

Master Builders believes that the Board's conduct operated to discriminate against non-union contractors due to the allegedly pro-union provisions of the PLA. However, the appellants are not a protected class under equal protection principles nor is a fundamental right involved. Accordingly, the Board's action in adopting the PLA need only meet rational basis scrutiny and be rationally related to a legitimate governmental interest. We believe the Board's actions meet such scrutiny.

Moreover, as we have discussed at length, the PLA states on its face that discrimination on the basis of union status is prohibited and there is no evidence that discrimination has or will occur in relation to the PLA. As the appellants themselves point out in their brief, the provisions of the PLA are problematic for union and non-union contractors alike. There is no disparate impact on individuals in one or the other group or a violation of the Master Builders' right to equal protection under the law.

## 3. Free Association.

Master Builders also argues that the PLA forces non-union contractors to affiliate with union contractors in contravention of the non-union contractors' right to not associate with particular persons.

U.S. Const. amend. I; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462, 475 (1984). Although a measure of the PLA incorporates provisions that may be seen by some as "union practices," we do not believe that the PLA prevents the appellants "from freely expressing their 'merit shop philosophy' and opposition to unions, nor does it coerce 'pro-union' expressions or association." *San Francisco Airports Comm'n*, 87 Cal.Rptr.2d 654, 981 P.2d at 517. Contractor members of the appellant organizations may feel disinclined to bid or do work under the provisions of the PLA, but "the First Amendment does not oblige the government to minimize the financial repercussions of such a choice." *Id.* (citing *Lyng v. Int'l Union, U. Auto., Aerospace, & Agric. Implement Workers of Am., UAW*, 485 U.S. 360, 368, 108 S.Ct. 1184, 1190–91, 99 L.Ed.2d 380, 389–90 (1988)). The adoption of the PLA does not impinge on the appellants' free association rights.

## IX. Conclusion.

We can find no infirmity with the PLA or its adoption by the Board, or the district court's similar finding. Iowa's right-to-work law bars compulsory unionism, which is not instituted or condoned by the PLA. Iowa's competitive bidding law allows for broad discretion on the part of a political subdivision in pre-defining the universe of acceptable bidders for a public contract, discretion that covers the decision to adopt the PLA. The Board's utilization of the PLA is a proprietary function that escapes preemption under the NLRA and ERISA. Further, none of the decisions or actions surrounding the adoption of the PLA has violated Master Builders' constitutional rights. We conclude that the use of the PLA for the Iowa Events Center is permissible under current Iowa

and federal law and the district court's finding of the same should be affirmed.

**AFFIRMED.**

All justices concur except LARSON, J., who dissents.

LARSON, Justice (dissenting).

I dissent because I believe this PLA violates both the letter and the spirit of our right-to-work law, Iowa Code section 731.1:

> It is declared to be the policy of the state of Iowa that no person within its boundaries shall be deprived of the right to work *at the person's chosen occupation for any employer* because of membership in, affiliation with, withdrawal or expulsion from, or refusal to join, any labor union, organization, or association, and any contract which contravenes this policy is illegal and void.

(Emphasis added.)

The Board argues for a narrow interpretation of the statute, one that the majority appears to adopt:

> The right-to-work statutes prohibit a narrow range of conduct, essentially confined to the refusal to hire an applicant or the termination of an existing employee because of his status as a member or nonmember of a labor organization.

This statute is not as limited in its protection of free choice as the Board suggests. The statute protects the right to *work*—not just the right to enter into or keep a contract of employment based on union or nonunion status. In other words, in a worker's relationship with an employer, it should make no difference if the worker is union or nonunion. The majority suggests this is no problem here and there will be no discrimination against nonunion workers. I believe this is unrealistic for the reasons I will discuss later.

Under the PLA, all hiring must be done through union hiring halls and in accordance with a crew ratio provision in the PLA. Under the PLA, an employer will be limited on the number of his own employees (referred to as core employees) who may be used on a project. All remaining workers must be taken from the union hall with no initial choice on the part of the employer.

A small employer with fourteen or fewer core employees may use 50% of its regular employees. With larger employers, however, the percentage of core employees is reduced proportionately to the size of the contractor's workforce. A contractor who has 100 core employees and needs all of them may use only fourteen of them. The balance is to be provided through the union hiring hall. The balance of the employer's core employees, if the employees want to work on their *own employer's* project, will have to go through the union hall. They, together with all other available workers, including nonemployees of the company, union and nonunion, seek to go to work for an employer with whom they already *had* a job. The Board contends this is no problem because the agreement requires the union hall to refer workers on a nondiscriminatory basis— nonunion as well as union. I believe it is naive to think this is a meaningful protection for nonunion workers because union officials determine which workers in the hiring pool are "qualified" to do the job.

The majority discounts this reality by pointing to a provision in the PLA that prohibits the hiring hall from discriminating against nonunion workers. However, it will be easy for union personnel to prefer their own members over nonunion workers on the subjective ground they are more qualified.

The majority contends that the Supreme Court case of *Local 357, International Brotherhood of Teamsters* supports the Board's argument that an antidiscrimination agreement in the PLA will legitimize this arrangement. I believe that case is inapposite because it did not provide for selection of employees on the same basis as the present case. In fact, the PLA in *Local 357, International Brotherhood of Teamsters* provided that the assignment out of the union hiring hall would be done on the basis of seniority—an objective standard as compared to the determination of "qualification," as provided in the PLA in this case. *See Local 357, Int'l Bhd. of Teamsters*, 365 U.S. at 669, 81 S.Ct. at 836, 6 L.Ed.2d at 14.

The effect of this PLA is to create an uneven playing field for certain employers and their workers, based on their nonunion status. It therefore violates the words and the spirit of our right-to-work law, and the case should be reversed on that ground.