**IN THE COURT OF APPEALS OF IOWA**

No. 14-1591
Filed November 25, 2015

**LEGACY BANK,**
          Plaintiff-Appellee,

**vs.**

**JOHN F. HOLMES and
RUTHANN HOLMES,**
          Defendants-Appellants.
_____

          Appeal from the Iowa District Court for Johnson County, Paul D. Miller,

Judge.


          Mortgagors appeal the district court's foreclosure ruling. **AFFIRMED**.


          Thomas D. Hanson of Dickinson, Mackaman, Tyler & Hagen, P.C., Des

Moines, for appellants.

          John D. Hunter, Alexander M. Johnson, and Haley R. Van Loon of Brown,

Winick, Graves, Gross, Baskerville & Schoenbaum, P.L.C., Des Moines, for

appellee.


          Heard by Vogel, P.J., and Vaitheswaran and Bower, JJ.

**BOWER, Judge.**

John and Ruthann Holmes appeal the district court's ruling foreclosing mortgages in favor of Legacy Bank on their residence. The Holmes family claims the Small Business Association (SBA) is an indispensable party to this consumer foreclosure. SBA became a junior lienholder on the residence after it authorized a commercial loan for John Holmes Publishing Company ("JHP Company"). The Holmes family also claims the doctrine of equitable estoppel should preclude Legacy Bank from an award of a deficiency judgment. We affirm.

## I.    Background Facts and Proceedings

John's long-term accountant, David Merritt, started working for DeWaay Financial Management. Merritt and a financial advisor, also from DeWaay, called Brian Chittenden, executive vice president of Legacy Bank, and invited Chittenden to a lunch meeting with John. Chittenden testified the "main points" of discussion were John's company, the company's history, the company's business, and what John had done "for a number of years, that [John] was in a couple of lending relationships and institutions that they were thinking about changing, and that might include, at some point, in looking at some loans with the company as well."

Thereafter, the Holmes family asked Legacy Bank to consolidate and refinance some of the family's existing debt—a note secured by their personal residence (an Iowa City condominium) and a note "against investment accounts." On August 6, 2008, the Holmes family refinanced those obligations by executing a promissory note in favor of Legacy Bank for $1,109,935 at 6.5% interest. The

note was separately secured by an August 6, 2008 open-end mortgage on the condominium and by an "assignment [of investment accounts] dated 8-6-2008." The 2008 mortgage also secured "[a]ll future advances from [Legacy Bank] to Mortgagor (the Holmes family) or other future obligations of [the Homes family] to [Legacy Bank] under any promissory note." The 2008 mortgage became the first lien on the family condominium, and the family regularly paid the note's $7000 monthly payment.

John testified that in 2009, he hired an independent attorney to advise him about the SBA loan process for JHP Company and about "some of these other related issues about money we owed." John approached Chittenden about the possibility of Legacy Bank financing "the next phase" of JHP Company, i.e., consolidating its business debt and adding a "large amount" of additional debt for implementation of technology upgrades. Legacy Bank contracted with a third party to attempt to obtain a SBA loan for John's company. John's attorney assisted him during the negotiations for and execution of the SBA loan.

John testified he retired from the day-to-day management of his company in 2008. However, during the SBA loan process in November 2009, John and Ruthann signed a personal financial statement listing their net worth at $864,446 and stating John's yearly salary was $399,426. John and Ruthann assigned a value of $800,000 to their condominium, while identifying the 2008 Legacy Bank mortgage and a second mortgage for a Regions Bank home equity loan.[1]

---

[1] During the foreclosure process, Legacy Bank valued the condominium in the $600,000 range.

John testified the whole process with the SBA took longer than he expected, causing him to dip into his cash reserves "to float the company in the meantime." However, John also testified he was "pulling too much money out of [his] company." John agreed that at the time he entered into the SBA loan in February 2010, he certified JHP Company was in good condition. Chittenden explained it took a long time from John's initial discussions with the bank to a completed business loan:

> The bulk of the issue . . . was kind of a vague . . . amount of money that was brought up at different times. And it wasn't really ever the same amount. And there was a desire for us to have a . . . very good accounting for what the money was going to be used for, the strategic plan for the money, [along with] multiple different documentation needs . . . to do a SBA financing package that [Legacy Bank] had hired a third party to put together.
> . . . .
> The SBA process is a very lengthy process, in which there are a number of different application steps. There are a number of different documentation requirements,[2] a number of background checks, a lot of vetting of [the] history of the company, financial performance, and the ongoing viability and projections of what the company expects to achieve with the capital deployed.

On December 28, 2009, the SBA approved Legacy Bank's application for "SBA to guarantee 90% of a loan . . . in the amount of $1,300,000 to assist" JHP Company. In the loan authorization, SBA instructed Legacy Bank to close the loan and listed numerous SBA forms Legacy Bank, as the lender, was required to use, including note, guarantee, and limited guarantee. SBA required Legacy Bank to document that JHP Company "used the loan proceeds for the purposes stated in this authorization."

---

[2] For example, the SBA required a real estate appraisal of JHP Company's real property, which valued that property at $225,000. The SBA required life insurance on John's life "satisfactory to lender."

Chittenden testified that as a part of the SBA process, the Holmes family's 2008 "note for the condo residence and the investment accounts had to be redone because of the need for the SBA to have certain pieces of collateral," i.e., the investment accounts. In the SBA authorization, SBA required Legacy Bank to perfect liens on collateral, including (1) a first mortgage lien on the real property of JHP Company; (2) a first perfected security interest in JHP Company personal property (equipment, fixtures, inventory, accounts, etc.); (3) an assignment to Legacy Bank by John F. Holmes (shareholder of JHP Company) of all interest in DeWaay Capital Management brokerage account; (4) a "guarantee on SBA form 148, by John F. Holmes" secured by a third mortgage on the condominium that is subject only to two specific prior liens—Legacy Bank ($856,000) and Regions Bank ($76,150); and (5) a guarantee from Ruthann Holmes, also secured by SBA's third mortgage on the condominium.

On February 1, 2010, John sent a letter to the day-to-day manager of JHP Company, Charis Lloyd, terminating her employment.[3] Also on February 1, 2010, the Holmes family executed a personal note in favor of Legacy Bank in the amount of $884,677.62 at 5.75% interest, listing the purpose as "refinance personal residence." This refinancing lowered the family's monthly payments to

---

[3] Interestingly, although John would certify to the SBA on February 5, 2010, that his company's financial position had not changed during the application process, John's February 1 letter to Lloyd stated:

> You are well aware of [JHP Company's] dire financial condition, including the company's substantial delinquency with Legacy Bank. Holmes Publishing is insolvent. According to the bank, their willingness to forbear has been exhausted. I anticipate that the bank will soon acquire all of the pledged assets of the business, either by foreclosure or by means of a forced turnover.

$5000 a month. Chittenden testified the family's 2010 note essentially replaced the family's 2008 note.[4] The 2010 consumer note stated it was "separately secured by" a "real estate mortgage dated 8/8/2008 and an assignment of life insurance and an assignment of investment accounts dated 2/1/2010." Thus, Legacy Bank retained its position as first mortgagee on the condominium.

Several documents were executed on February 5, 2010. Legacy Bank signed the SBA loan authorization and accepted the SBA's conditions. JHP Company executed a SBA7(a) loan for $1,300,000. This was a 90/10 loan, meaning the loan was 90% guaranteed by the SBA and Legacy Bank carried 10% of the loan. JHP Company executed a borrower's certification, with John initialing each paragraph, and stating in relevant part: "A(2) Borrower and [JHP Company] (Operating Company) certify . . . [t]hat there has been no adverse change in Borrower's (and Operating Company) financial condition, organization, operations or fixed assets" and "C(6) Borrower and Operating Company will not . . . [a]llow total annual salaries . . . to officers or owners of borrower and operating company, and their immediate family members, to exceed $135,000." Also on February 5, 2010, the Holmes family executed an open-end mortgage on their condominium for $1,300,000 in favor of Legacy Bank.

In March 2010, Legacy Bank sold the SBA-guaranteed portion of the loan, much like the sale of a mortgage, for a premium of over $88,000. After the sale, the bank still had its 10% of the loan on its books.

---

[4] We observe the 2008 note in our record is marked: "Note Paid in Full 2-1-10 Legacy Bank."

According to Chittenden, JHP Company started missing its loan payments "within the first twelve months, and the company was, basically, bleeding cash for quite a lengthy period of time." John and his attorney met with Legacy Bank several times, trying to figure out a solution. The bank was told the new products "were implemented but had not taken off yet." The bank "petitioned the SBA to change the payments to an interest-only payment structure . . . to try to give time for some of the new products that they were developing to take hold."

In 2011, John and Ruthann failed to make the payments on the February 2010 consumer note. Legacy Bank worked with the Holmes family on options to keep them in the property.

John's attempt to sell the business was unsuccessful, and at some point the cash flow for JHP Company ran out. John and his attorney worked with the bank to reach a resolution on the business debt. Legacy Bank had to decide whether to foreclose the business or to request John turn over the business for the bank "to salvage what was left." Chittenden explained why the bank was willing to try a turnover of assets:

> [W]e hired a couple of experts to go out and look at the business to try to see what the problems were because of the speed at which it had faltered. And [the opinions from several sources were] that they believed it was a large management problem and a pay problem with some of the senior staff. And our intention was to come up with a solution where, hopefully, we could save the business, show value, and . . . obviously pay our notes off and get John and Ruthann out of the issue.

On February 1, 2012, Legacy Bank entered into a Master Agreement with the company and its guarantors, the Holmes family, in which Legacy Bank took over JHP Company. The bank hoped to put the company in a better position to

sell, and John had no further role in the business. Legacy Bank hired a bank subsidiary to run JHP Publishing. John testified he thought the company would become profitable after the turnover because he "believed in" the subsidiary group hired to run the company. Specifically, John thought company profits would ensue because he had given up his salary, "which I admitted was too high; Charis's was way out of bounds, her daughter. And we had twice the employees we needed." Therefore, "we lowered our employee compensation over a million dollars a year from what it was about a year before that. The big parts of that was John Holmes' [salary,] Charis Lloyd's salary, and Wendy Lloyd's." John believed the company had pretty good sales and also thought the salary reductions "gave [the subsidiary], say, a million dollars profit in addition to what they were going to make." But any possible sale of the company by Legacy Bank was delayed when Charis Lloyd sued the company and Legacy Bank. JHP Company filed a counterclaim against Lloyd alleging breach of fiduciary duty. The company did not assert a third-party claim against Legacy Bank. At the subsequent trial on the consumer notes, John admitted Lloyd's lawsuit would make the bank's sale of the business virtually impossible.[5]

Seven months after the Master Agreement, in September 2012, Legacy Bank sent the Holmes family a notice to cure the consumer default. In November 2012, Legacy Bank filed a petition to foreclose and request for lis pendens index, alleging the Holmes family entered into the 2008 and 2010 notes and mortgages, with the February 5, 2010 mortgage entered into "in order to secure the payment

---

[5] The employment dispute was settled shortly before the trial commenced on the consumer-loan foreclosure.

of [the 2010 note] and other obligations." The bank sought a personal judgment against the Holmes family for the principal sum of $873,285.88 plus interest through October 18, 2012 ($137.57 per day). The bank also sought judgment in rem against the real estate, attorney fees, and a post-sale deficiency judgment. The bank filed a motion for summary judgment. The Holmes family's April 2013 answer included numerous affirmative defenses and asked for dismissal. The Holmes family resisted summary judgment and in October 2013, filed a demand for delay of sale. Also in October 2013, the court denied Legacy Bank's first motion for summary judgment, stating the affirmative defenses raised fact issues.

Trial commenced on November 7, 2013, with Chittenden and John testifying. John testified the consumer notes tied to the 2008 mortgage on their condominium were separate loan transactions and separate obligations from John's company's loan obligations. At the close of the evidence, the Holmes family moved for a directed verdict, claiming the foreclosure proceedings should be stayed or dismissed because the SBA was not served with notice of the proceedings and also claiming the bank's conduct was so inequitable that the court should decline to enter a deficiency judgment.

While the court's resolution of the consumer foreclosure was pending, Legacy Bank accessed the Holmes family's investment accounts. Their attorney e-mailed the bank's attorney and protested. On February 28, 2014, the bank's attorney replied, explaining Legacy Bank, as the bank making the loan subject to a SBA guaranty, "is in charge of servicing and collecting on the loan." Also:

> 1. Legacy Bank has a security interest in the Holmes' accounts as acknowledged in your e-mail. In connection with that

security interest the Bank, the Holmes, and [the brokerage] executed a control agreement. The control agreement allows the Bank to offset the accounts in the event of a default. A judgment isn't required.

   2. The amounts acquired . . . will be applied to the SBA note.

   3. The Bank has not "defrauded" the Holmes. These accounts are security for the SBA note, and the Bank is acting in accordance with the agreements.

In March 2014, the Holmes family filed an application to reopen the evidence, stating the seized "accounts were those that had been pledged by Ruthann Holmes to the [SBA] to support the SBA guarantee. These were the same accounts that the [Bank] claimed it had a right to seize to reduce the deficiency it expected to have after foreclosure." Also, "the Bank has shown nothing to indicate that the 'SBA Note' is in default," and there "is no reason to believe the Bank's claims the 'proceeds will be used to pay down the SBA loan' . . . . The Bank is simply using self-help in violation of its agreement [in order] to get its hoped-for deficiency judgment."

The bank resisted: "Defendants continue their attempt to confuse the court that the SBA is somehow improperly missing from the proceeding before the court. This is not the case. In fact, the loans before the court in this foreclosure proceeding are not subject to an SBA guaranty." The bank's resistance also stated that the only relationship between the consumer notes and the SBA note "is that the [2010] mortgage backing [the 2010 consumer loan] served as additional security for the SBA loan. The SBA loan is a completely separate note, not involved or a part of [this] action."

The court granted the Holmes family's motion and conducted additional proceedings in late May 2014. Ruthann testified the consumer notes tied to the 2008 mortgage on their condominium were separate loan transactions and separate obligations from JHP Company's loan obligations. Ruthann also testified Legacy Bank had removed significant funds from the family's investment accounts in 2014 without notice. She admitted, however, the investment accounts had been pledged as collateral for the business loan. Ruthann was unable to produce a document setting forth a notice requirement. Chittenden testified similarly, the investment accounts were pledged as collateral for the SBA loan. Chittenden testified the accounts the bank accessed are not collateral for the consumer loan and none of the bank's agreements with JHP Company required the bank to give notice to the Holmes family of its actions with JHP Company.

The court entered judgment in favor of Legacy Bank in August 2014, and this appeal followed.

## II.     Standard of Review

The parties disagree on the standard of review. It is undisputed the bank filed its foreclosure action in equity. However, the bank contends the matter was tried at law because the court ruled on evidentiary objections and kept out allegedly objectionable testimony.

In determining whether a case was tried at law or in equity, one important test is whether the court ruled on evidentiary objections. *Master Builders of Iowa, Inc. v. Polk Co.*, 653 N.W.2d 382, (Iowa 2002). The record shows the district

court ruled on all the evidentiary objections raised by the parties, in some instances allowing the testimony and in other instances disallowing the testimony. We conclude our review is for errors at law.[6] *See Citizens Sav. Bank v. Sac City State Bank*, 315 N.W.2d 20, 24 (Iowa 1982) ("[W]e will consider and review a case on appeal in the manner it was treated below.").

## III.    SBA—Necessary Party

On appeal, the Holmes family claims the district court erred in failing to find the SBA was a necessary party to this consumer foreclosure. *See* Iowa R. Civ. P. 1.234(2) ("A party is indispensable . . . if notwithstanding the party's absence the party's interest would necessarily be inequitably affected by a judgment rendered between those before the court."). The Holmes family admits "there is law to the effect that a junior lienholder may not be a necessary party to a foreclosure action" but contends "the status of the SBA is unclear in these proceedings," due to Legacy Bank's accessing the investment accounts after the trial. The family claims there is "nothing left for the SBA—to say nothing for the [Holmes family]. Clearly, the SBA's interest was inequitably affected."

We find nothing unclear about the SBA's status. The SBA loan authorization showed the SBA's knowledge it was the *third* lienholder on the condominium property—subject to the prior liens of Legacy Bank and Regions Bank. The SBA-required pledge of the investment accounts as collateral for the *business* loan is undisputed. The SBA also required Legacy Bank to service the *business* loan. Whether Legacy Bank failed to appropriately apply the *business*

---

[6] Even under a de novo review and based on the issues presented on appeal, our ruling would be the same.

collateral (investment accounts) it accessed in 2014 to the *business* loan is a separate matter from this consumer foreclosure, and does not make the SBA a necessary party to this consumer foreclosure. In fact, one court has ruled the SBA is not even a necessary party in a dispute concerning a SBA *business* loan. *See Landes v. Capital City Bank*, 795 P.2d 1127, 1131 (Utah 1990) (stating "that because the SBA authorized [the bank] to sue on the [business] note and guaranties, the absence of the SBA does not prevent the guarantors from obtaining complete relief").

We find additional support for our conclusion the SBA is not a necessary party in long-standing Iowa case law. In the mid-1800's our supreme court established that junior lienholders-mortgagees, such as the SBA, are not necessary parties in a senior lienholder-mortgagee's foreclosure action: "Nor is the making of subsequent mortgagees parties indispensable, for the reason that the law of foreclosure . . . not only does not require it, but . . . seems to contemplate that a mortgage may be foreclosed without making them parties." *Heimstreet v. Winnie*, 10 Iowa 430, 431 (1860). The *Heimstreet* court stated a foreclosing plaintiff could *elect* to make a subsequent mortgagee a party but also recognized: "It is one thing to allow a subsequent mortgagee to be made party and quite another to insist that he must be." *Id.* (ruling debtor-mortgagor "has no right to speak for" a junior creditor-mortgagee and rejecting debtor-mortgagor's claim the foreclosing mortgagee had to perfect service on the junior mortgagee). As in *Heimstreet*, the objection here comes from the debtor-mortgagor (the Holmes family) and not from the junior mortgagee (the SBA). Accordingly, the

SBA is not a necessary party. *See id.*; *see also Donnelly v. Rusch*, 15 Iowa 99, 100 (1863) ("Though a proper, [the junior incumbrancer] was not a necessary, party.").

## IV. Equitable Estoppel and Unclean Hands

Urging us to apply the doctrine of equitable estoppel, the Holmes family seeks to avoid a post-sale deficiency judgment on their consumer notes. Both parties agree the district court correctly set out the elements the Holmes family had to prove to be successful: "(1) a false representation or concealment of material facts [by Legacy Bank], (2) lack of knowledge of the true facts on the part of the [Holmes family], (3) intention to be relied upon, and (4) reliance thereon by [the Holmes family to their] prejudice and injury." The district court also correctly noted an "estoppel may arise under certain circumstances from silence or inaction." The Holmes family asks us to "review the documentary evidence relating to the SBA loan," claiming Legacy Bank made misrepresentations or material omissions in its (1) preparation of the SBA loan application, (2) its administration of the SBA loan, and (3) its takeover of all the business assets of JHP Company.

Although the Holmes family asks us to interweave the business transaction into this case premised on consumer notes, in the Master Agreement between Legacy Bank and JHP Company (borrower) and the Holmes family (guarantors), the Holmes family specifically acknowledged the distinction between their consumer debt and the company's business debt:

> [JHP Company] and Guarantors acknowledge that the
> Guarantors borrowed money from [Legacy Bank] and delivered to

[Legacy Bank] a note, dated February 1, 2010, in the original principal amount of [$884,677.62] ("the Consumer Promissory Note"). The Consumer Promissory Note was for personal purposes. As security for repayment of the Consumer Promissory Note, each of the Guarantors executed and delivered in favor of [Legacy Bank] a certain Real Estate Mortgage dated August 6, 2008, Assignment of Life Insurance and Assignment of Investment Accounts and related documents (together with the Consumer Promissory Note, the "Consumer Transaction"). [JHP Company] and Guarantors agree that [the Master Agreement] does not apply to the Consumer Transaction and that [Legacy Bank] retains the right to exercise all of its legal and equitable rights under the Consumer Promissory Note and related consumer documents.

We reject the Holmes family's request that we should consider, in this consumer-foreclosure action, the bank's alleged misrepresentations and omissions regarding the separate and distinct business note. We conclude any such alleged representations or omissions "relating to the SBA loan," a loan that was executed *after* the consumer notes at issue herein, are extraneous matters. Equitable estoppel is inapplicable.

The Holmes family also claims Legacy Bank comes to the consumer foreclosure with "unclean hands" because the bank "orchestrated this situation. Legacy Bank sought and received a SBA guarantee of a $1.3 million loan ostensibly to provide working capital to a company that John Holmes owned. In fact, a substantially larger portion of that loan was used to pay off Legacy debt."

The record does not support this claim. John testified he received the loan proceeds, or working capital, that he expected to receive from the SBA loan. A February 16, 2010 memo detailed the "use of proceeds": $495,746.76 for working capital; $524,444.40 "to pay notes payable to Bank Iowa"; $255,393.84 to pay notes payable to Legacy Bank; and $14,415 to pay closing costs. Thus,

the amount of working capital that John expected and the company received exceeded the amount "used to pay off Legacy debt." Further, John was the party approaching Legacy Bank, and John was the party seeking to consolidate his company's debt and obtain additional working capital to upgrade company technology. The bank did not "orchestrate" but rather acted to facilitate John's goals for his company. Finally, the SBA loan accomplished John's goals by refinancing his company's existing business debt and by providing additional working capital; the term "ostensibly" is totally inapplicable. We cannot improve on the well-reasoned analysis of the district court, which we adopt.

> The [district] court finds no evidence of a misrepresentation on the part of [Legacy Bank] in the parties' entry into the written agreements. The agreements set forth the parties obligations thereunder, and Mr. Holmes was aware of the state of affairs of his business and his and Mrs. Holmes' personal financial situation. Mr. Holmes had legal representation during the process that led up to the Master Agreement being executed. The court finds no motivation on the part of [Legacy Bank] to conceal facts from [the Holmes family] to convince the [Holmes family] to enter into the agreements. If the business had performed successfully, as all parties anticipated and hoped, there would have been no prejudice and injury on the part of [the Holmes family], but the business failed to perform up to expectations. Equitable estoppel does not apply to these facts.
>
> Nor has [Legacy Bank] come to this action with unclean hands . . . . There is simply no evidence in the record that [Legacy Bank] engaged in inequitable, unfair, dishonest, fraudulent, or deceitful conduct that has harmed [the Holmes family]. Rather, [the record] is clear that [Legacy Bank] made an extensive effort to provide all the assistance it could to [the Holmes family] to ensure that [the Holmes family] were able to meet their obligations, which would have been beneficial to all parties.

**AFFIRMED.**